**BROADWAY 41ST STREET REALTY CORP. and Rosenthal & Rosenthal Inc., Plaintiffs,**

v.

**The NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Vincent Tese, as Chairman of the New York State Urban Development Corporation, The City of New York, Edward I. Koch, as Mayor of the City of New York, and Times Square Center Associates, Defendants.**

**No. 89 Civ. 3213 (PKL).**

United States District Court, S.D. New York.

March 29, 1990.

LeBoeuf, Lamb, Leiby & MacRae (Jacob Friedlander, Jonathan E. Polonsky and Lynn A. Dummett, of counsel), and Norman Dorsen, New York City, for plaintiffs.

Dewey, Ballantine, Bushby, Palmer & Wood (Eric J. Lobenfeld, Saul P. Morgenstern, Elizabeth M. Guggenheimer, Karen A. Estilo, of counsel), Berle, Kass & Case (Stephen L. Kass, Jean M. McCarroll, Deborah Goldberg, of counsel), and New York State Urban Development Corp. (Valerie Caproni and Joseph Petillo, of counsel), New York City, for defendants New York State Urban Development Corp. and Vincent Tese.

Peter L. Zimroth, Corp. Counsel for City of New York (Robert J. Pfeffer and Susan M. Shapiro, of counsel), New York City, for defendants City of New York and Edward I. Koch.

Kaye, Scholer, Fierman, Hays & Handler (Jo Davis and Darrell M. Joseph, of counsel), New York City, for defendant, Times Square Center Associates.

## ORDER AND OPINION

LEISURE, District Judge:

Plaintiffs Broadway 41st Street Realty Corporation ("Broadway 41st") and Rosen-thal & Rosenthal Inc. ("Rosenthal") brought suit for damages and injunctive relief against certain public and private entities engaged in the 42nd Street Development Project (the "Project"). The amended complaint alleges that defendants have effected a *de facto* taking of plaintiffs' property, have conducted a conspiracy to mislead the public by disseminating false information on the timing and details of the Project, and have commenced bad faith condemnation proceedings in state court which should be enjoined. Plaintiffs have alleged that defendants have acted in these ways under the color of state law in violation of 42 U.S.C. § 1983.

Defendants The New York State Urban Development Corporation (the "UDC"), Vincent Tese, Chairman of the UDC, The City of New York (the "City"), and Edward I. Koch, Mayor of the City (collectively, the "public defendants") and Times Square Center Associates ("TSCA") have moved the Court to dismiss the amended complaint under Fed.R.Civ.P. 12(b) and pursuant to the abstention doctrine. In addition, defendant Vincent Tese argues that he is not a proper defendant under 42 U.S.C. § 1983, and that the amended complaint should be dismissed against him.

## FACTUAL BACKGROUND

Plaintiffs Broadway 41st and Rosenthal are owner of and tenant in, respectively, an office building located at 1451 Broadway in New York City. The building, located on the north side of 41st Street, is within the boundaries of the 42nd Street Development Project, a joint public-private plan to develop the real estate in the area of west 42nd Street in Manhattan. Under condemnation proceedings filed by the UDC in New York State Supreme Court on May 2, 1989, plaintiffs' property would be condemned and transferred to defendants for redevelopment. On May 10, 1989, plaintiffs filed a complaint in this Court, which was amended on June 29, 1989. Defendants thereafter moved to dismiss the amended complaint. Before discussing in detail the amended complaint and defendants' motions to dismiss, a thorough consideration

of the factual background is needed concerning the history and current status of the Project, prior attempts to oppose it in the courts, and the pending condemnation proceedings in state court.

The 42nd Street Development Project officially began in 1980 with a Memorandum of Understanding between the City and the UDC which set forth a plan to redevelop a once classic, and now infamous, area of midtown Manhattan. The Project called for a significant reconstruction of the area in order to realize its commercial potential, eliminate blight, and create beneficial spillover effects into adjacent underdeveloped areas.[1] The original plan called for four office towers, a hotel, eight renovated theatres, a wholesale mart, restaurants, retail spaces, and a renovated subway station. After the Memorandum of Understanding was signed by the City and the UDC, the UDC made official findings indicating the benefits of the Project pursuant to Sections 16 and 10 of its own enabling statute, the New York State Urban Development Corporation Act. N.Y.Unconsol.Laws § 6251 et seq. (McKinney 1979 & Supp.1989). The Board of Estimate of the City of New York approved the Project on November 8, 1984, and authorized the Mayor to enter into specific agreements with the UDC and certain designated developers.

There were many who did not share UDC's and the City's rosy view of the Project. Indeed, over the next several years, a total of 42 lawsuits were commenced concerning the project, seeking injunctive and monetary relief on a wide variety of grounds. Affidavit of Eric J. Lobenfeld, Esq., sworn to on August 3, 1989, Exhibit M ("Lobenfeld Aff.").[2] A sampling of the plethora of litigation includes an unsuccessful challenge on antitrust grounds, on first amendment, equal protection, and due process grounds, under New

York City's Uniform Land Use Review Procedure, and under the Clean Air Act.[3] Counsel for Public Defendants assert that 16 of these lawsuits have been brought by the same plaintiffs as in this litigation, or their principals, affiliates, or counsel. Lobenfeld Aff., Exhibit N. The Court takes note of the repeated appearances of certain litigants over the past several years, and the consequential delay that litigation has caused to the Project. Yet this Court is mindful that those whose home or business is subject to imminent seizure by the state may have legitimate grievances. An extended series of lawsuits might be expected.

In June, 1987, the UDC and the City contracted with a private developer, Times Square Center Associates, for the development of the four office tower sites which straddle Seventh Avenue at the eastern end of the Project. No contracts have yet been executed for the development of the wholesale mart, the hotel, or the theatres or restaurants. Amended Complaint, ¶ 18. Though the four office tower sites will probably be the largest and most expensive parts of the construction, it is clear that UDC and the City are in need of significantly more private investment to carry out the Project as originally planned.

The agreements between the UDC and TSCA govern to a great degree how compensation will be paid to owners of the condemned properties. In order to guarantee compensation, TSCA posted a $155 million letter of credit and placed it in an escrow account. The Public Defendants allege that this amount represents slightly more than 120% of the appraisal value of the property being condemned. Memorandum of Law in Support of the Public Defendant's Motion to Dismiss the Amended Complaint at 7. It is unclear, however, at

---

1. The objectives and early history of the Project have been discussed in depth by other courts. See Wilder v. Thomas, 854 F.2d 605, 607–08 (2d Cir.1988), cert. denied sub nom. Wilder v. New York State Urban Dev. Corp., —— U.S. ——, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989); Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp., 771 F.2d 44, 45 (2d Cir.1985); Jackson v. N.Y. State Urban Dev. Corp., 67 N.Y.2d 400, 503 N.Y.

S.2d 298, 494 N.E.2d 429 (1986), aff'g 110 A.D.2d 304, 494 N.Y.S.2d 700 (1st Dep't 1985).

2. Eric J. Lobenfeld, Esq., is counsel for the Public Defendants.

3. For a more complete list of past litigation, see Wilder v. Thomas, supra, 854 F.2d at 608.

what date these appraisal values were calculated. The terms of the escrow agreement allow TSCA to block release of the funds if "Significant Litigation" is pending. Thus if TSCA believes that pending litigation significantly threatens its ability to gain title of or to develop the properties, it may block disbursement of the funds held in escrow.

On May 2, 1989, UDC filed a petition in New York State Supreme Court to condemn properties within the Project area pursuant to the New York Eminent Domain Procedure Law (the "EDPL"). The petition seeks court permission authorizing UDC to file an acquisition map with the court and thereby gain title in fee to such properties. Certain properties owned or leased by plaintiffs are among those specified to be condemned. The state court is at present only considering issues arising under Article 4 of the EDPL which creates procedures for the filing of acquisition maps (§ 402), the vesting of title (§ 402), and the possession of condemned properties by the condemnor (§ 405). The state proceedings are not at this time considering issues of compensation under Article 5 of the EDPL. The final appraisal of property values and the award of just compensation will not be reviewed by the state court unless and until UDC prevails in the Article 4 phase of the condemnation proceedings.

On May 10, 1989, plaintiffs filed this action in federal court. Defendants promptly moved to dismiss the complaint, and plaintiffs thereafter filed an amended complaint on June 29, 1989. The pending motions relate to the amended complaint. The first claim for relief of the amended complaint alleges that defendants have effected a *de facto* taking of plaintiffs' property in violation of the Takings Clause of the fifth amendment to the U.S. Constitution, as applied to the states through the fourteenth amendment, and 42 U.S.C. § 1983. The second claim for relief charges a conspiracy amongst defendants to effect such an unconstitutional taking in violation of § 1983. The third claim for relief alleges that the Project, in its present scaled-down form, violates the Public Use

Clause of the fifth amendment to the U.S. Constitution, as applied to the states through the fourteenth amendment, and § 1983.

The thrust of plaintiffs' argument is as follows: the imminent threat of the condemnation of properties within the Project area, having existed now for nearly ten years, has caused a pronounced decline in the value of plaintiffs' properties. Thus, even though there has been no *de jure* taking, plaintiffs deserve to be compensated at the present time due to the consequences of defendants' actions. Defendants have been aware over the past several years that the Project would not go forward in a timely fashion, if at all, and yet they have allegedly perpetuated a myth of imminent condemnation through intentional misrepresentations to the public. In addition, plaintiffs allege that the Project in its current form, with private development contracts secured for only the four office tower sites on Seventh Avenue, is not so beneficial as to constitute a "public use" under the fifth amendment. Thus the eminent domain powers of the state may not be employed.

Plaintiffs seek monetary relief for the alleged *de facto* takings effected to date, an injunction preventing defendants from issuing further allegedly false and misleading statements concerning the status or timing of the Project, and an injunction blocking defendants from taking further steps to condemn properties within the Project area until non-contingent funds are secured for compensation purposes and defendants are able to proceed lawfully with the Project as originally planned. Thus plaintiffs are asking that this Court enjoin the current condemnation proceedings, pending in state court, given current circumstances.

The public defendants have moved this Court to abstain from deciding issues which are properly being litigated in state court under either *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ("*Younger* abstention"), or *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47

L.Ed.2d 483 (1976) (*"Colorado River* abstention"). The public defendants argue that the federal court action is essentially duplicative of the state court proceedings, and that any interference with those proceedings would violate the principles of federalism, comity, and wise judicial administration. Plaintiffs oppose the public defendants' motion on the grounds that not all plaintiffs' federal constitutional interests will be adequately protected in the state condemnation proceedings, and thus the intervention of this Court is needed.

Defendant TSCA joins in the arguments for abstention put forward by the public defendants, and also moves the Court to dismiss the complaint as plaintiffs have not alleged a sufficient factual basis to underpin a *de facto* takings claim. In addition, TSCA argues that plaintiffs have not indicated TSCA's role in the alleged misinformation conspiracy with sufficient particularity. Similarly, TSCA claims that its alleged role in violating the Public Use Clause of the fifth amendment has not been adequately established by plaintiffs. For these reasons, TSCA asks that the entire complaint be dismissed against it.

## DISCUSSION

■ The decision of the United States Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, have established the principle that federal courts should in general refuse to enjoin ongoing state judicial proceedings. Though the reach of the *Younger* abstention doctrine has been expanded by the courts over the past two decades, the basic policy rationale has remained the same—a system of federalism demands comity between judiciaries with overlapping jurisdictions. This guiding principle is important for both abstract and practical reasons. In the early days of the union, comity was necessary to minimize strain on the relations between state and federal governments. Comity will continue to be crucial to the future of federalism as well. *See Younger, supra*, 401 U.S. at 44–45, 91 S.Ct. at 750–51. On a more practical level, abstention can avoid the waste and confusion of duplicative judicial proceedings, with the concomitant potential for inconsistent or counterproductive results.

*Younger v. Harris* held that a federal court should refuse to enjoin an ongoing state criminal proceeding absent bad faith, harassment, or other unusual circumstances calling for equitable relief. *Younger, supra*, 401 U.S. at 54, 91 S.Ct. at 755. In subsequent cases, the Supreme Court has expanded the principles of *Younger* to apply to state civil and administrative proceedings. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). In *Middlesex County*, the Court stated that "[t]he policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." *Middlesex County, supra*, 457 U.S. at 432, 102 S.Ct. at 2521 (*citing Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979)).

The central inquiry which courts have pursued, in deciding whether to abstain under the *Younger* doctrine, is whether the state proceedings afford an adequate opportunity to litigate the issues subsequently brought to federal court. *See Middlesex County, supra*, 457 U.S. at 432, 102 S.Ct. at 2521; *Moore v. Sims, supra*, 442 U.S. at 430, 99 S.Ct. at 2380; *CECOS Int'l, Inc. v. Jorling*, 895 F.2d 66 (2d Cir.1990); *Davis v. Lansing*, 851 F.2d 72, 76 (2d Cir.1988). The Supreme Court in *Middlesex County* stated that "[a]bstention is based upon the theory that ' "[t]he accused should first set up and rely upon his defense in the state court ... unless it plainly appears that this course would not afford adequate protection." ' " *Middlesex County, supra*, 457 U.S. at 435, 102 S.Ct. at 2523 (*quoting Younger, supra*, 401 U.S. at 45, 91 S.Ct. at 751 (*quoting Fenner v. Boykin*, 271 U.S. 240, 244, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926))).

In the case at bar, it is of the utmost importance to understand the nature of plaintiffs' legal claims. Only then can the Court decide whether they are before the state court. As will be discussed in detail below, this Court holds that plaintiffs' *de facto* takings claims for damages and its requests for injunctive relief preventing defendants from "condemning plaintiffs' property" or "taking any further actions to condemn plaintiffs' property" involve issues that are or will be before the state court. *See* Relief Requested, ¶¶ A, C, and D, Amended Complaint at 57–58.[4]

The Court also believes that plaintiffs' allegation that defendants have engaged in a campaign to mislead the public concerning the status and timing of the Project will be before the state court. *See* Relief Requested, ¶ B, Amended Complaint at 57. Plaintiffs have, in fact, asserted this claim in response to UDC's condemnation petition. *See* Memorandum of Law in Support of the Public Defendants' Motion to Dismiss the Amended Complaint at 16. The state court will not be considering whether to enjoin defendants' alleged misinformation campaign. But if the court does approve the condemnation, it will then consider in monetary terms the compensation owed to plaintiffs taking into account defendants' actions and their effect on the value of plaintiffs' property. If the state court does not approve the condemnation, then plaintiffs will have an opportunity to return to this Court to prove that they are entitled to monetary and injunctive relief due to defendants' conduct.

To abstain from exercising jurisdiction under the *Younger* doctrine, a court must answer the following three questions in the affirmative: (1) Is there an ongoing state judicial proceeding? (2) Does the state proceeding implicate important state interests?

(3) Is there an adequate opportunity to raise constitutional challenges in the state proceedings? *See e.g., Middlesex County, supra,* 457 U.S. at 432, 102 S.Ct. at 2521; *CECOS Int'l, Inc., supra,* 895 F.2d 66 (2d Cir.1990); *The University Club v. The City of New York,* 842 F.2d 37, 40 (2d Cir.1988). The Court will consider each of these questions in turn.

### A. Judicial Nature of Ongoing State Proceedings

Plaintiffs argue that the current condemnation proceedings brought by the UDC in state court do not qualify as "ongoing state judicial proceedings" and thus cannot trigger abstention under *Younger*. In *New Orleans Public Service, Inc. v. Council of City of New Orleans,* —— U.S. ——, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("*NOPSI*"), the Supreme Court held that a federal district court could not abstain from considering injunctive and declaratory relief against action by the New Orleans City Council denying the plaintiff utility a rate increase. The Court noted that while *Younger* abstention had been extended to cover civil and even administrative proceedings, it has never applied to proceedings that are not "'judicial in nature.'" *NOPSI, supra,* 109 S.Ct. at 2509 (*quoting Middlesex County, supra,* 457 U.S. at 433–34, 102 S.Ct. at 2522).

In the *NOPSI* case, the New Orleans City Council refused to grant a rate increase to a retail electrical utility on the grounds that the utility's management had been negligent in not diversifying its supply portfolio. Plaintiff NOPSI filed a petition in state court for review of the Council's final rate order. NOPSI also sought declaratory and injunctive relief in federal district court on the grounds that the Council's order was preempted by federal law.

---

**4.** No matter how plaintiffs attempt to characterize the relief sought for purposes of this motion, it is clear that this Court is being asked to enjoin the state court condemnation proceedings to determine, *inter alia,* whether there are sufficient noncontingent funds with which to compensate plaintiffs and whether the Project in its current form violates the Public Use Clause of the fifth amendment to the U.S. Constitution. In terms of monetary relief, *Younger v. Harris*

abstention has been invoked by federal courts when parallel state court actions were considering similar claims for money damages, and the federal action demanded both monetary and injunctive relief under § 1983, as in the case at bar. *See Deakins v. Monaghan,* 484 U.S. 193, 108 S.Ct. 523, 529, 98 L.Ed.2d 529 (1988); *see also Watts v. Burkhart,* 854 F.2d 839, 849 (6th Cir.1988); *Martin v. Merola,* 532 F.2d 191, 195 (2d Cir.1976).

The district court granted the Council's motion to dismiss for lack of jurisdiction and, alternatively, abstained from adjudicating the action. The Fifth Circuit reversed the district court's decision on jurisdiction but ruled that abstention was proper under either *Younger* or *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *New Orleans Public Service, Inc. v. City of New Orleans*, 798 F.2d 858 (5th Cir.1986). The Fifth Circuit found the administrative proceeding before the City Council to be an ongoing judicial proceeding as it was appealable to the Civil District Court for the Parish of New Orleans and thus " 'within the appellate jurisdiction' " of the Louisiana courts. *NOPSI, supra*, 798 F.2d at 864 (*quoting Ohio Civil Rights Comm'n, supra*, 477 U.S. at 627, 106 S.Ct. at 2722).

The Supreme Court reversed the Fifth Circuit and held that *Younger* abstention was not appropriate in those circumstances. Even accepting as true the defendant City Council's argument that its ratemaking authority and any ensuing judicial review should be seen as a unitary and ultimately judicial process, the Court stressed that the plaintiff NOPSI must be able to demonstrate that the City Council proceedings themselves qualified for *Younger* treatment. *NOPSI, supra*, 109 S.Ct. at 2518–19. Since the Council proceedings were not judicial in nature—indeed, ratemaking has traditionally been viewed as a legislative activity—*Younger* abstention could not be invoked with regard to them. *Id.* at 2519–20; *see District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476–79, 103 S.Ct. 1303, 1311–13, 75 L.Ed.2d 206 (1983); *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226–27, 29 S.Ct. 67, 69–70, 53 L.Ed. 150 (1908).

Plaintiffs in the case at bar argue that "UDC's condemnation determination, like the ratemaking proceeding in *NOPSI*, is not judicial in nature." Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss, at 34. The Court disagrees with plaintiffs' statement. The issues now before the state court are judicial by nature—to wit, whether UDC's condemnation plan comports with the Public Use Clause of the fifth amendment, and what compensation should be paid to plaintiffs. The cases cited by plaintiffs for the proposition that eminent domain proceedings are always legislative are not of great assistance, as they describe only in general terms the nature of the eminent domain power. *See Orange County v. Metropolitan Transportation Authority*, 71 Misc.2d 691, 697, 337 N.Y. S.2d 178, 188 (Sup.Ct. Orange Co.), *aff'd*, 39 A.D.2d 839, 332 N.Y.S.2d 420 (2d Dep't 1971); *Brown v. McMorran*, 39 Misc.2d 716, 719, 241 N.Y.S.2d 483, 486 (Sup.Ct. Westchester Co.1963), *rev'd on other grounds*, 23 A.D.2d 661, 257 N.Y.S.2d 74 (2d Dep't 1965). Because the exercise of eminent domain power manifests characteristics of both legislative and judicial authority, the Court must look more closely at context and the practical concerns of the case.

The condemnation proceedings now pending in state court are essentially judicial in nature. The focus of those proceedings will be to determine through judicial means whether certain legislative decisions should be validated as being in accordance with the law, and what compensation should be paid if a taking occurs. Under EDPL § 402(B)(4), condemnees (and therefore plaintiffs in this suit)

> may appear and interpose a verified answer, which must contain specific denial of each material allegation of the petition controverted by him, or of any knowledge or information thereof, sufficient to form a belief, or a statement of new matter constituting a defense to the proceeding.

This provision creates the parameters for an essentially judicial proceeding between condemnors and condemnees, allowing the condemnees to make arguments to the court concerning the legality of the legislative determinations previously taken, in this case by the UDC and the City of New York. Furthermore, as will be discussed in detail below, if the court validates the condemnation, it will then proceed to determine just compensation for the condemnees. *See* EDPL §§ 501–514.

The Court does not believe that extreme reliance should be placed on the often semantic distinction between legislative and judicial action. The Supreme Court in *NOPSI* concluded its discussion by pointing out that abstention by the federal court in Louisiana did not fulfill the policy aims of the *Younger* abstention doctrine—to wit, the avoidance of interference by federal courts with ongoing state proceedings. *NOPSI, supra,* 109 S.Ct. at 2520. The plaintiff NOPSI was attempting to argue before the federal court that the City Council's rate order had been preempted by the recent Supreme Court decision in *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), while the state court was conducting a substantive review of the rate order itself. This issue of preemption was not before the state court when the federal court decided to abstain, though NOPSI later amended its complaint to include the preemption claim. *See NOPSI, supra,* 109 S.Ct. at 2512. In the case at bar, however, consideration by this Court of plaintiffs' claims for monetary or injunctive relief would directly interfere with the state court condemnation proceedings and thus violate the principle of comity on which the *Younger* doctrine is established.

In many instances, federal courts have abstained from interference with state court eminent domain proceedings. *See Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *Ahrensfeld v. Stephens,* 528 F.2d 193, 198–99 (7th Cir.1975); *Creel v. City of Atlanta,* 399 F.2d 777, 779 (5th Cir.1968); *Duty Free Shop, Inc. v. Administracion de Terrenos de Puerto Rico,* 708 F.Supp. 468, 469–70 (D.P.R.1989). None of these cases has explicitly inquired into the legislative or judicial nature of state court review of land seizures under eminent domain, but all have stressed the applicability of the comity concerns which underpin *Younger v. Harris* to state court eminent domain proceedings.

### B. Importance of State Interests

The second prong of the test for *Younger* abstention requires that the federal court determine that important state interests are implicated by the proceedings in state court. With regard to this part of the test, the Supreme Court has stated: "Proceedings necessary for the vindication of important state policies or for the functioning of the state judicial system ... evidence the state's substantial interest in the litigation." *Middlesex County, supra,* 457 U.S. at 432, 102 S.Ct. at 2521 (*citing Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977)). The inquiry does not focus on the importance of the particular exercise of state power—in this case, the building of the 42nd Street Development Project—but rather on the importance of the eminent domain power to the state in the abstract. *NOPSI, supra,* 109 S.Ct. at 2516.

The Court finds that New York State has a substantial interest in the exercise of eminent domain. The power to condemn land and to devote it to a public purpose is central to a state's ability to support economic development and the general welfare. Due to the sensitive nature of the state's power to condemn the land of its citizens, eminent domain has remained a local political issue. *See Louisiana Power & Light, supra,* 360 U.S. at 28–29, 79 S.Ct. at 1072–73; *Ahrensfeld, supra,* 528 F.2d at 198; *Duty Free Shop, Inc., supra,* 708 F.Supp. at 469–70.

### C. Opportunity to Raise Federal Constitutional Claims

To abstain from exercising jurisdiction under *Younger v. Harris,* a court must determine that the parallel state action provides the federal court plaintiff with an adequate opportunity to raise constitutional claims. *Ohio Civil Rights Comm'n, supra,* 477 U.S. at 627–29, 106 S.Ct. at 2722–24; *Middlesex County, supra,* 457 U.S. at 432, 102 S.Ct. at 2521.

Plaintiffs put forward two arguments in support of their claim that they will not be provided a sufficient opportunity to raise their federal constitutional claims in the state condemnation proceedings. First, plaintiffs characterize the state court pro-

ceedings as only providing for the filing of an acquisition map and the giving of notice to all condemnees under Article 4 of the EDPL. The pending state court proceedings, in their view, will not consider any compensation issues, thus preventing any opportunity for plaintiffs' *de facto* takings claims to be litigated. Second, plaintiffs claim that New York State law greatly limits the circumstances under which recovery can be had for *de facto* takings. Each of these arguments will be considered in turn.

The state court is currently engaged in proceedings under Article 4 of the EDPL which governs how a condemnor files acquisition maps with the court (§ 402(A)), gives notice to condemnees (§ 402(B)(2)), and sets forth the public use for which the property will be employed (§ 402(B)(3)(d)). In deciding whether to enter an order validating the condemnation, the court allows for condemnees to make appearances and assert legal defenses (§ 402(B)(4)). When and if the court decides that condemnation is appropriate, issues of compensation will then be considered under Article 5 of the EDPL. Article 5 provides for service of notice of the acquisition to all condemnees (§ 502), the filing of claims for damages by condemnees (§§ 502–03), the filing of appraisals and expert testimony by the parties (§ 508), and a decision by the court fixing monetary relief based on the evidence heard (§ 512).

It is an overly technical characterization of the state court proceedings to assert that issues of compensation are not "before" the state court. The state court is not at present considering compensation, as it has not yet even decided whether condemnation is proper under Article 4. But if the court does so decide, then it will continue on to decide the appropriate monetary relief under Article 5. This Court views the state court condemnation proceedings as one unified judicial proceeding which fully provides plaintiffs with the opportunity to raise their federal constitutional claims, albeit at different stages in the proceedings.[5]

Plaintiffs will not suffer from the limited scope of recovery for *de facto* takings given by New York law. Under New York law, a plaintiff may recover for a *de facto* taking only upon a physical intrusion onto the plaintiff's land short of condemnation. *See Fisher v. City of Syracuse*, 78 Misc.2d 124, 355 N.Y.S.2d 239 (Sup.Ct. Onondaga Co.1974), *aff'd*, 46 A.D.2d 216, 361 N.Y. S.2d 773 (4th Dep't 1974), *cert. denied*, 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975). However, if the state court validates the seizure, compensation would be calculated as for a *de jure* taking, rather than a *de facto* taking. The limited scope of *de facto* takings under New York law would no longer be relevant.

In determining just compensation, the state court will presumably consider whether plaintiffs' properties have suffered from a lowering of value due to impending condemnation known as "condemnation blight." In *City of Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971), the New York Court of Appeals held that condemnation blight should be taken into account by courts in determining the proper amount of compensation to be paid in eminent domain proceedings. In making the distinction between *de facto* takings and condemnation blight, the court stated:

> ... [I]t is clear that a *de facto* taking requires a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property. On the other hand, "condemnation blight" relates to the impact of certain acts on

**5.** In *CECOS Int'l, Inc., supra*, 895 F.2d 66 (2d Cir.1990), the Second Circuit held that the district court should not have abstained under *Younger* when there was no pending state court proceeding, even though there was a strong possibility that one would be commenced in the near future. In the case at bar, condemnation proceedings have been already commenced in state court. If the state court does validate the seizure, it will automatically continue to consider compensation. If it does not validate the seizure, then plaintiffs may return to this Court for adjudication of their *de facto* takings claims.

the value of the subject property. It in no way imports a *taking* in the constitutional sense, but merely permits of a more realistic valuation of the condemned property in the subsequent *de jure* proceeding. In such a case, compensation shall be based on the value of the property at the time of the taking, as if it had not been subjected to the debilitating effect of a threatened condemnation.

*J.W. Clement Co., supra,* 28 N.Y.2d at 256, 321 N.Y.S.2d at 357, 269 N.E.2d at 907. Thus in the case at bar, plaintiffs will have an opportunity to prove and collect the same damages before the state court as they request before this Court today.

### D. "Bad Faith" Exception to Younger Abstention

■ A federal district court should not abstain from interfering with state court proceedings if those proceedings have been brought in bad faith. *Younger, supra,* 401 U.S. at 54, 91 S.Ct. at 755. Plaintiffs allege that defendant UDC has commenced the state court condemnation proceedings in bad faith, as defendants do not possess the means to follow through with the complete Project plan and properly to compensate the condemnees. Plaintiffs argue that UDC filed the condemnation petition as the culminating step in its campaign to mislead the public as to the imminence of the Project.

In defining the "bad faith" exception to the *Younger* doctrine in the context of a pending state criminal trial, the Supreme Court has stated that " 'bad faith' in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant,* 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975). Since *Younger v. Harris* was decided in 1971, the Supreme Court has yet to

invoke the "bad faith" exception to abstention. Wright, Miller & Cooper, *Federal Practice and Procedure,* Jurisdiction 2d, § 4255 at 254. The Supreme Court has also ruled that *Younger* abstention should be applied "except in the very unusual situation that a [federal court] injunction is necessary to prevent great and irreparable injury." *Ohio Civil Rights Comm'n, supra,* 477 U.S. at 626, 106 S.Ct. at 2722.

Plaintiffs in the case at bar have not demonstrated that any exception to the *Younger* doctrine applies. Though defendants have not lined up all the private developers needed to reconstruct the entire Project area and compensate all condemnees within the area, there is no evidence that the state court condemnation proceedings were brought in bad faith. This Court believes that UDC's condemnation petition filed with the state court is a sound first step towards the ultimate realization of the Project, taken in the utmost good faith.

### E. Summary

Given that the Court finds that the three *Younger* inquiries have been answered in the affirmative with regard to certain of plaintiffs' claims for relief, and that the exceptions to the *Younger* doctrine do not apply, the Court abstains from considering those claims at this time.[6] Thus the Court will not consider plaintiffs' request for damages on the theory of the *de facto* takings doctrine or plaintiffs' request for injunctive relief which interferes with the ongoing state condemnation proceedings. The Court will not consider defendant TSCA's motion to dismiss the *de facto* takings claim or the conspiracy claim at this time.[7]

Plaintiffs' *de facto* takings claims for monetary relief should be placed on the suspense calendar pending completion of

**6.** The Court also bases its holding on the abstention doctrine of *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Under that doctrine, a federal district court may abstain from exercising jurisdiction on the grounds of "wise judicial administration." *Id.* at 817, 96 S.Ct. at 1246. The Court believes such a holding is clearly mandated by the relevant six-part test, especially the concerns of avoiding piecemeal

litigation and the adequacy of the state forum to protect the plaintiff's federal rights. *See Corcoran v. Adra Insurance Company, Ltd.,* 657 F.Supp. 1223, 1234–35 (S.D.N.Y.1987).

**7.** If the Court were to consider defendant TSCA's motion to dismiss the *de facto* takings claim and the conspiracy claim and dismiss them on the merits, plaintiffs might be tempted to replead the claims in an attempt to withstand

the state court condemnation proceedings. *See Deakins v. Monaghan*, 484 U.S. 193, 108 S.Ct. 523, 529, 98 L.Ed.2d 529 (1988). Dismissal of the Amended Complaint is not proper. If plaintiffs are not compensated in full accordance with their federal constitutional rights, plaintiffs will have an opportunity to reopen their claims before this Court. Similarly, if the state court denies the UDC's condemnation petition, plaintiffs will be able to litigate their *de facto* takings claims.

## CONCLUSION

The Court hereby abstains from exercising jurisdiction with regard to plaintiffs' *de facto* takings claims for monetary relief and plaintiffs' requests for equitable relief enjoining or interfering with the current state court condemnation proceedings. Plaintiffs' claims are hereby placed on the suspense calendar.

SO ORDERED.

---

the standards of Fed.R.Civ.P. 12(b)(6). This would further delay this litigation and hence the state condemnation proceedings. Abstaining from jurisdiction allows the state court to proceed without apprehension that this collateral proceeding will be revitalized prior to its final determination of the issues before it.