**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**Joan McDONALD, Commissioner, The New York State Department of Transportation, Defendant.**

**No. 12 Civ. 2731(CM).**

United States District Court, S.D. New York.

Sept. 26, 2013.

7

Charles E. Dorkey, III, McKenna Long & Aldridge, New York, NY, Christina Marleen Carroll, Craig Damon Rust, Daniel Joseph Carrigan, McKenna Long & Aldridge LLP, Washington, DC, for Plaintiff.

William James Taylor, Jr., Mark Eliott Klein, Office of The Attorney General, New York, NY, for Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

The question presented by this case is whether New York State has the authority to condemn property owned by National Railroad Passenger Corporation, known as Amtrak, in the face of certain federal statutes that created Amtrak and govern the use of its property. Amtrak brought this action against the Commissioner of the New York State Department of Transportation, asserting that the Commissioner's effort to condemn Amtrak-owned property along the Bronx River is preempted by federal law. The State has already condemned six parcels of Amtrak property, and has plans to condemn one additional parcel, as part of the "Bronx River Greenway" project—a joint New York State, New York City, and federal redevelopment project to restore the riverfront, which includes the development of parks, bike paths, and running and walking trails along the Bronx River.

The parties have filed cross-motions for summary judgment. For the reasons that follow, Defendant's motion for summary judgment is granted and Plaintiff's is correspondingly denied.

## BACKGROUND

### I. The Parties

Plaintiff National Railroad Passenger Corporation ("Amtrak") is a private, for-profit District of Columbia corporation created by the Rail Passenger Service Act of 1970, 49 U.S.C. § 24101 *et seq.* *See* 49 U.S.C. § 24301. It operates intercity and commuter rail service throughout the United States, including Bronx County, New York, for which purpose it owns and utilizes certain real property and railroad rights of way that were conveyed to it pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.* ("Rail Act").

The United States owns more than fifty percent of Amtrak's capital stock. Through the U.S. Secretary of Transportation, the United States holds a first mortgage on all Amtrak property. *See* 49 U.S.C. § 24907(a). However, "Amtrak ... is not a department, agency, or instrumentality of the United States Government." 49 U.S.C. § 24301(a)(3).

Defendant Commissioner Joan McDonald is the Commissioner of the New York State Department of Transportation ("NYSDOT"). Pursuant to sections 22 and 30 of the New York State Highway Law (the "Highway Law") and the New York Eminent Domain Procedure Law (the "EDPL"), the Commissioner and her authorized agents and delegees at NYSDOT

have the authority to acquire property by eminent domain on behalf of the State of New York "for state highway purposes." Highway Law § 22. The Commissioner is being sued here in her official capacity.

## II. The Commissioner's Purported Acquisition of the Amtrak Property

### A. The Bronx River Greenway Project

The Bronx River Greenway project (the "Greenway") is a joint federal, New York State, and New York City redevelopment project to develop a 23–mile long ribbon of parkland with a multi-use path that will extend along the entire length of the Bronx River, from its mouth at the East River to its source in Westchester County. Thus far, approximately 15 miles of the Greenway have been completed, which including the cleanup of the Bronx River, the restoration of much of its waterfront, the renovation of several existing parks, and the development of new parkland, bike paths, running and walking trails, and canoeing facilities in the Bronx.

One of the goals of the Greenway is to develop open green space in the economically disadvantaged neighborhoods of the South Bronx, which have long been deprived of such outdoor park and recreation areas. NYSDOT is responsible for implementing the portion of the Greenway that stretches from Westchester Avenue to West Farms Square, near East Tremont Avenue in the Bronx. To date, NYSDOT has (1) reconstructed Starlight Park, located along the banks of the Bronx River between East 172nd Street and East 174th Street, with new soccer and softball fields, playgrounds, picnic areas, and a floating dock; (2) developed of new green space, bike paths, and running and walking trails; and (3) built a new pedestrian bridge across the Bronx River north of East 174th Street.

NYSDOT also has plans to develop the Greenway between Westchester Avenue and East 172nd Street in the Bronx. At issue in this case is certain property located in this area of the Bronx, owned by Amtrak, that was or is in the process of being condemned by NYSDOT as part of the project.

### B. The Amtrak Parcels at Issue in this Action

There are seven parcels at issue, all located near Amtrak's railroad tracks in the "Northeast Corridor," the rail line connecting New York and Boston, and one of the busiest stretches of rail line in the world. The Court refers to these parcels collectively as the "Amtrak Bronx Rail Property."

The Commissioner claims that she, pursuant to her eminent domain power, already acquired title to six of the parcels (defined below as Parcels 105, 107, 108, 109, 110, and 111) on behalf of the State of New York. The Commissioner has begun, but not yet completed, the acquisition process with respect to the remaining parcel (Parcel 178).

More specifically:

*Parcel 105.* Map 105 R–1, Parcel 105 is a 5,141.5 square-foot parcel of land, located just north of Westchester Avenue in the Bronx, on the west side of Bronx River, and on the east side of Amtrak's tracks. (*See* Carroll Decl. Ex. A at 4; Carroll Decl. Ex. G.)

The Commissioner has appropriated this parcel in fee and plans to build a pedestrian bridge on it, over the Bronx River. Excavation and pile driving will be required to build the bridge abutments on Parcel 105.

Prior to its purported acquisition by the State, Parcel 105 was used by the adjacent

property owner as a parking lot to store impounded vehicles. Parcel 105 has not been used by Amtrak for any purpose since at least 2000, and Amtrak has no particular plans to use the parcel in the future.

**Parcels 107, 108, and 109.** Identified on Map 107, Parcels 107, 108, and 109 are strips of property on the east and west sides of Amtrak's tracks between the Bronx River and East 172nd Street, covering 1,702.5 square feet, 2,140.8 square feet, and 1,029.8 square feet, respectively. (*See* Carroll Decl. Ex. B.)

The existing retaining wall along Amtrak's tracks is located on these three parcels, and the Commissioner has obtained permanent easements on the parcels in order to construct and maintain a new retaining wall along the tracks. The parcels are located a few feet from operating railroad tracks.

Prior to the State's purported acquisition of these parcels, the parcels were used only for the existing retaining wall. Aside from maintaining this retaining wall, Amtrak has no particular plans to use the parcels in the future.

**Parcels 110 and 111.** Identified on Map 108 R–1, Parcels 110 and 111 are strips of land along the east and west sides of Amtrak's tracks, just north of East 172nd Street, which cover 34.38 square feet and 433.78 square feet, respectively. (*See* Carroll Decl. Ex. C.)

Like Parcels 107, 108, and 109, Parcels 110 and 111 contain portions of Amtrak's track-side retaining wall. The Commissioner has obtained permanent easements on the parcels in order to construct and maintain a new retaining wall. These parcels are also located a few feet from operating railroad tracks. Aside from maintaining the retaining wall, Amtrak has no

particular plans to use the parcels in the future.

**Parcel 178.** Map No. 175, Parcel No. 178 is a 6,395.92 square foot aerial easement which the Commissioner seeks in order to construct and maintain a pedestrian bridge over Amtrak's tracks at East 172nd Street to the newly-reconstructed Starlight Park.

A bridge over Amtrak's track existed at this location for many years, while Amtrak's trains ran underneath it. That bridge was knocked down more than a decade ago, but its abutments were left intact, with the exception of the western abutment. The City of New York, which maintained the prior bridge, has asserted that it retains the right to rebuild a new bridge at this same spot.

As discussed below, the Commissioner began eminent domain proceedings with respect to Parcel 178 and the other six parcels that she has already condemned in 2005, but she has not completed the proceedings with respect to Parcel 178.

Additionally, Amtrak contends that exercising control over or constructing upon any of these parcels would impact Amtrak because construction near rail lines can disturb the soil beneath the property. Also, even though Amtrak has no knowledge of specific contaminants in the area, and has designated the property as low risk, it asserts that construction on the property may still pose some hypothetical risk to the environment.

## C. The New York State Eminent Domain Proceedings

The Commissioner began eminent domain proceedings with respect to each of the seven parcels at issue in this case in 2005. For Parcels 105, 107, 108, 109, 110, and 111, these proceedings concluded in

2008; for Parcel 178, the proceedings are ongoing.

### 1. The May 2005 EDPL Public Hearing

Pursuant to Article 2 of the EDPL, the Commissioner commenced eminent domain proceedings in 2005, by noticing and holding a public hearing regarding the development of the Bronx River Greenway between Westchester Avenue and East Tremont Avenue, and NYSDOT's intention to acquire by eminent domain the necessary property for this development. *See* EDPL §§ 201–203.

In April and May 2005, notice of the public hearing was published in several area newspapers, including, from April 19, 2005 to April 23, 2005, in the New York *Daily News*. (Weld Decl. ¶ 14; Exs. 16–19.) Notice was also sent to, among others, "all the home owners who[se] property is being impacted by the Project as well as the two businesses being relocated." (Weld Decl. ¶ 14; Ex. 16.)

NYSDOT's records reflect that a letter informing Amtrak of the public hearing was mailed to Amtrak by May 9, 2005. (Taylor Decl. Exs. 20–21.) The notice letter, which is dated May 2, 2005, is addressed to Amtrak at "R Street, Washington, D.C." According to Amtrak, the company has never had offices on R Street, and it has no record of receiving the letter. The letter states, in pertinent part, "In an effort to give you a more complete understanding of the project and how it will affect your property, you are invited to attend the Eminent Domain Procedure Law (EDPL) hearing for this project." (Taylor Decl. Ex. 22.)

Amtrak would not, however, have been surprised to receive such a letter. For several years before the condemnation proceedings began, Roger Weld, a NYSDOT Professional Engineer, had been communicating with various Amtrak representatives about the Greenway project, including Earl Watson of Amtrak, Amtrak's Director of I & C Projects, who was at the time an Amtrak Project Development Officer and who was designated Amtrak's 30(b)(6) witness in this case. In August 2004, NYSDOT sent Amtrak its design plans for the Greenway for Amtrak's comments; Amtrak provided initial comments in October 2004.

During the week of May 2, 2005, Mr. Weld left a phone message for Watson regarding the public hearing. On May 11, 2005, Mr. Weld sent an e-mail to Mr. Watson, following up on his voicemail. (Taylor Decl. Ex. 22.) He informed him again of the public hearing scheduled for May 19, 2005 and identified the specific Amtrak property at issue in this case. (*Id.*)

Mr. Watson replied to the email on May 12, 2005, copying various other Amtrak representatives, including Amtrak's in-house counsel and other "appropriate people who were in authority to address the issue." (*Id.*) He indicated that Sheila Mary Sopper, also copied on the email, was the "appropriate Amtrak representative that NYSDOT should contact regarding all real estate issues related to NYSDOT's Bronx River Greenway Project," and that she would contact Mr. Weld "to discuss Amtrak's real estate requirements." (*Id.*) It is thus clear that Amtrak had advance notice of the hearing.

NYSDOT held the EDPL public hearing on May 19, 2005, at a public school building in the Bronx. No one from Amtrak participated in the hearing. NYSDOT's records do not indicate that anyone from Amtrak attended. Amtrak did not make any written submissions in connection with the public hearing, which were accepted until May 29, 2005.

## 2. NYSDOT's August 2005 Determination and Findings

On August 17, 2005, NYSDOT issued its "Determination and Findings" with respect to the Greenway project and its purported acquisitions of the property at issue here. (Taylor Decl. Exs. 24–25.) Pursuant to section 204 of the EDPL, the DOT's Determination and Findings set forth, among other things, the public use, benefit, and purpose of the project, the approximate location of the project in the Bronx, and the reasons for the DOT's selection of that location.

A synopsis of the Determination and Findings was published in the New York *Daily News* on August 19, 2005. It states, in pertinent part, "The Property owners who may wish to challenge condemnation of the property via judicial review may do so only on the basis of issues, facts and objections raised at the May 19, 2005 EDPL hearing for the subject project. Under sections two hundred seven and two hundred eight of Article 2 EDPL, 'the exclusive venue for judicial review of the condemner's determination and findings is the appellate division in the judicial department where any part of the property to be condemned is located'." (Taylor Decl. Ex. 24.)

NYSDOT's records also show that the synopsis was mailed to Amtrak at "R Street, NW Washington, DC 20001." Amtrak has no record of receiving a synopsis of the Determination and Findings. Amtrak's 30(b)(6) witness in this case, Mr. Watson, acknowledged that he was aware of NYSDOT's issuance of the Determination and Findings, but he could not recall when he became aware of it. (Taylor Decl. Ex. 45, Amtrak Dep. at 247–50.)

Amtrak never brought any kind of legal proceeding in New York state court to challenge any of the steps the NYSDOT took to purportedly acquire the parcels.

## 3. The Commissioner's Purported Acquisition of Parcels 105, 107, 108, 109, 110, and 111 in February 2008

It is undisputed that the Commissioner completed the EDPL acquisition process with respect to Parcels 105, 107, 108, 109, 110, and 111.

Pursuant to Section 401, the Commissioner had three years from the date of NYSDOT's publication of the Determination and Findings, in August of 2005, to commence proceedings under Article 4 of the EDPL to acquire the property at issue. EDPL § 401(A). After some communications between DOT and Amtrak officials in the intervening time regarding the property acquisition process, on May 14, 2007, Angela Miraglia, a DOT Real Estate Specialist, wrote to Sheila Mary Sopper, Project Director of Amtrak Real Estate Development Department, to advise Amtrak that the Commissioner would be acquiring Parcels 105, 107, 108, 109, 110, and 111. (Taylor Decl. Ex. 28.)

On January 28, 2008, Ms. Miraglia wrote to Ms. Sopper again, providing Amtrak, as required by Article 3 of the EDPL, with the State's offer of appraised compensation for those parcels in the total amount of $252,275.00, and informing Amtrak that NYSDOT expected to take title to the property within the next few weeks. (Taylor Decl. Exs. 29–30.)

Three weeks later, on February 19, 2008, the Commissioner filed notices of appropriation and maps with respect to each of the six parcels with the Bronx County Clerk, and, on February 20, 2008, the acquisition documents were marked as "recorded or filed" in the Office of the City Register of the City of New York. (Taylor Decl. Exs. 1a–1c, 2a–2c, 5–7.) Under EDPL § 402(A), title in Parcels 105, 107, 108, 109, 110, and 111 vested in the State

once the acquisition documents were marked as "recorded or filed." EDPL § 402(A).

By three letters dated February 21, 2008, NYSDOT sent Amtrak copies of the notices of appropriation and maps that had been filed, informing Amtrak that title in the six parcels was vested in the State and providing the "official notice. of . . . appropriation" required by the EDPL. (Taylor Decl. Exs. 31–33.)

Amtrak refused to accept the "just compensation" offered by the State for its purported acquisitions of Parcels 105, 107, 108, 109, 110 and 111 by eminent domain. On September 28, 2008, the State Attorney General's Office informed Amtrak that "Pursuant to Section 304 of the Eminent Domain Procedure Law, the State Comptroller deposited the sum of $261,041.55 [the original offer plus interest] in an Eminent Domain account." (Taylor Decl. Ex. 34.) The sum deposited by the State Comptroller remains in that account.

#### 4. Parcel 178

On October 29, 2009, NYSDOT sent a letter to Amtrak informing it that the Department "has found it necessary to acquire an additional permanent easement" Parcel 178 for the purpose of constructing and maintaining a bridge over Amtrak's tracks at East 172nd Street. (Taylor Decl. Ex. 40.) This 172nd Street bridge had always been a part of the NYSDOT's plans for the Greenway, and was a subject of discussion at the May 19, 2005 public hearing. (Def.'s 56.1 Stm't ¶ 81; Ex. 23 at 17.)

Because the City of New York maintained that it had retained the easement rights to rebuild this bridge over Amtrak's tracks, NYSDOT had not originally deemed it necessary to acquire these same rights from Amtrak. (Def.'s 56.1 Stm't ¶ 82.) For various reasons, the Commissioner has not yet completed the acquisition of Parcel 178. Section 401(C) of the EDPL provides that the State has ten years from the date the initial Determination and Findings for the project were published that is, until August 2015 to complete the acquisition process.

#### D. Amtrak's Offer to Sell Parcels 105, 107, 108, 109, 110, and 111 to NYSDOT

On August 13, 2009, Amtrak sent a letter to NYSDOT, enclosing a proposed "Easement Agreement" with respect to Parcels 107, 108, 109, 110 and 111 and its proposed "Agreement of Sale" with respect to Parcel 105. (Taylor Decl. Exs. 35–36.) By these documents, Amtrak offered to convey the parcels to the State—for exactly the amount of compensation that had previously been offered by NYSDOT as "just compensation" for the acquisition of the parcels by eminent domain, but subject to certain conditions and requirements. For projects that pose low environmental risk and provide little or no benefits to Amtrak—like this one—Amtrak generally includes certain protective language in its purchase and sale agreements; in the agreements it sent to NYSDOT, Amtrak required NYSDOT to provide it with an environmental indemnity and to obtain acceptable insurance therefor.

By letter on August 28, 2009, NYSDOT acknowledged receipt of the materials, but responded that the State had already acquired title to the property at issue, noting that the "maps were vested 2/2008." (Taylor Decl. Ex. 39.)

### III. The Present Action

Almost three years later, on April 9, 2012, Amtrak commenced this action, seeking a declaratory judgment that federal law preempted and prohibited the Commissioner from condemning Amtrak's

property or taking any action in furtherance of such condemnation. It also seeks an order to enjoin the NYSDOT Commissioner from taking any actions related to the Amtrak Bronx Rail Property, such as exercising control over or constructing upon the Amtrak Bronx Rail Property.

The stakes here are clear enough. Amtrak has no interest in the subject property and is willing to part with it for the same amount of money that the State has placed in escrow for that very purpose. The only live issue is whether acquisition was properly effected by eminent domain, or whether the State has to buy the property from Amtrak. Amtrak, having chosen not to raise the preemption issue in the eminent domain proceeding, belatedly brings it before this Court.

## THE FEDERAL STATUTORY FRAMEWORK AND AM-TRAK PROPERTY

By the early 1970s, railroads operating in the Northeast and Midwest faced an economic crisis that threatened the railroads' extinction. In June 1970, the Penn Central railroad filed a petition for bankruptcy reorganization, and other railroads soon followed. Eventually, eight major railroads in the region filed for bankruptcy. The railroads "were failing at such a rapid rate that Congress stepped in to resolve the regional rail crisis." *City of Philadelphia v. Consolidated Rail Corp.*, 222 F.3d 990, 992 (D.C.Cir.2000).

## I. The Rail Passenger Service Act (RPSA)

In response to the rail crisis, Congress first enacted the Rail Passenger Service Act (RPSA) in 1970. *See* 49 U.S.C. § 24101 *et seq.*

The RPSA authorized the creation of Amtrak for the purpose of providing intercity passenger rail service. Amtrak's mis-

sion is defined as "providing efficient and effective intercity passenger rail mobility consisting of high quality service that is trip-time competitive with other intercity travel options ..." 49 U.S.C. § 24101(b). Congress found that the provision of passenger rail transportation was important to achieving a number of federal policies, such as energy conservation and self-sufficiency, 49 U.S.C. § 24101(a)(5), and the alleviation of overcrowding on highways and at airports, 49 U.S.C. § 24101(a)(2).

To achieve these goals, the RPSA requires that Amtrak "maximize the use of its resources, including the most cost-effective use of employees, facilities, and real property." 49 U.S.C. § 24101(c)(12). The RPSA also grants Amtrak the authority to "coordinate the uses of the Northeast Corridor, particularly intercity and commuter rail passenger transportation," 49 U.S.C. § 24101(c)(11), and directs Amtrak to "minimize government subsidies," 49 U.S.C. 24101(c)(1). Through subsequent amendments to assist in carrying out the RPSA, Congress has also given Amtrak the authority to acquire and dispose of property needed for improvement of intercity rail transportation. 49 U.S.C. § 24904(a)(1).

## II. The Regional Rail Reorganization Act of 1973 (Rail Act)

When it became apparent that it was not possible to reorganize a viable rail system through the pending bankruptcy proceedings, Congress responded by enacting the Regional Rail Reorganization Act in 1973 ("Rail Act"), 45 U.S.C. § 701 *et seq.*

The Rail Act created the United States Railway Association (USRA), which prepared a Final System Plan that designated the "rail properties" (owned by the bankrupt railroads) that were needed to provide rail service. *See* 45 U.S.C. §§ 711(a),

716. "Rail properties" were defined as those "used or useful in rail transportation service." 45 U.S.C. § 702(14).

The Rail Act also created the Consolidated Rail Corporation ("Conrail") for the purpose of continuation of freight rail service. As part of this process, the Rail Act directed the conveyance of all the "rail properties" that were identified in the Final System Plan to Conrail from the railroads' bankruptcy estates. 45 U.S.C. §§ 741(a), 743(b). In turn, the Final System Plan required Conrail to convey rail properties that were "used or useful" for intercity passenger rail service to Amtrak. 45 U.S.C. § 716(c)(1)(C, D). The Rail Act also dictated that the Final System Plan designate which property should be conveyed to the states for rail transportation and recommend whether any rail properties not otherwise required for rail transportation were instead suitable for recreation. 45 U.S.D. § 716(c)(1)(D, E).

The Final System Plan became effective after review by Congress. 45 U.S.C. §§ 718, 719(a). The USRA then had 90 days to deliver the Final System Plan to the Special Court, a rail court created by the Rail Act, and to certify to the court the terms of the transfer. 45 U.S.C. § 719(c). The conveyance process was supervised by the Special Court and implemented through a conveyance order of that court. 45 U.S.C. § 719(b); Order of Conveyance Relating to the Rail Act Properties of Persons Leased, Operated, or Controlled by Railroads in Reorganization in This Region, *In the Matter of Reg'l Rail Reorganization Proceedings*, Misc. No. 75–3 (Special Ct. Mar. 25, 1976). Pursuant to the Rail Act, Final System Plan, and resulting conveyance orders of the Special Court, Conrail retained the properties used for freight transportation but immediately reconveyed to Amtrak and other railroads the rail properties used for rail passenger service. The rail properties were conveyed "free and clear of any liens and encumbrances." 45 U.S.C. § 743(b)(2).

The Rail Act conveyance process drew upon both the United States' bankruptcy power and eminent domain authority. *Norwich & Worcester R.R. Co. v. United States*, 408 F.Supp. 1398, 1404–05 (Reg'l Rail Reorg.Ct.1976); *Stratford Land & Improvement Co. v. Blanchette*, 448 F.Supp. 279, 284–85 (Reg'l Rail Reorg.Ct. 1978). As part of the conveyance process, the federal government compensated Penn Central and the other transferor railroads for their rail properties in the range of billions of dollars. *See Penn Cent. Corp. v. United States*, 862 F.Supp. 437, 446 (Reg'l Rail Reorg.Ct.1994) (Wisdom, J.); *Stratford Land*, 448 F.Supp. at 284–85.

As part of the conveyance process, on March 30, 1976, the Amtrak Bronx Rail Property was conveyed by the Trustees of the Penn Central Bankruptcy Estate to Conrail by Deed No. PC–CRC–ATK–RP–29. (*See* Carroll Decl. Ex. E.) Subsequently, effective April 1, 1976, the Amtrak Bronx Rail Property was conveyed from Conrail to Amtrak by Deed No. NY5/PC–CRC–ATK–RP–29. (*See* Carroll Decl. Ex. F.)

The functions of the Special Court have now been assumed by the U.S. District Court for the District of Columbia. 45 U.S.C. § 719(b)(2). The Special Court has exclusive jurisdiction to interpret, alter, amend, modify, or implement its conveyance orders. 45 U.S.C. § 719(e)(2).

## DISCUSSION

Amtrak moves for summary judgment on the grounds that (1) the NYSDOT Commissioner's acts to take the Amtrak Bronx Rail Property are impliedly preempted by the Rail Act and the RPSA, (2) the NYSDOT Commissioner's acts are preempted because the federal govern-

ment has occupied the field of ownership and control of Amtrak property, (3) the acts are expressly preempted by 49 U.S.C. § 24902(j) (the "federal enclave provision") and 49 U.S.C. § 24301(g) of the RPSA, as amended, and (4) the acts impair and will continue to impair the federal government's mortgage interest in the property, in violation of the Property Clause of the Constitution.

The NYSDOT Commissioner moves to dismiss the complaint in its entirety or, in the alternative, for summary judgment. She first raises jurisdictional and procedural grounds for dismissal of Amtrak's claims, arguing that: (1) the Court has no subject matter jurisdiction over most of Amtrak's claims because they are barred by the Eleventh Amendment, (2) all of the claims are barred on waiver grounds, (3) all of the claims are barred on statute of limitations grounds, and (4) the claims with respect to Parcel 178 should be dismissed under the *Younger* abstention doctrine. The Commissioner also seeks dismissal on the grounds that Amtrak's preemption claims fail on the merits.

The jurisdictional and procedural issues raised by the Commissioner are dispositive. Since a more than sufficient record already exists in this case, and at least some of the questions raise issues of fact (for example, whether Amtrak received proper notice of the State's eminent domain proceedings, and whether Amtrak's claims are barred by a statute of limitations), I evaluate both motions as motions for summary judgment.

## I. Standard of Review

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party.

## II. Amtrak's Claims With Respect to Parcels 105, 107, 108, 109, 110, and 111 Are Barred by the Eleventh Amendment

The Eleventh Amendment provides that, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. In this Circuit, a finding that the defendant is entitled to sovereign immunity means the court lacks subject-matter jurisdiction. *See McGinty v. New York,* 251 F.3d 84, 101 (2d Cir.2001). *Under Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), a federal court must first find that it has jurisdiction to hear a claim before addressing the merits, even if the merits question is "easy."

■ The Supreme Court has interpreted the Eleventh Amendment to bar suits in federal courts against states, by their own citizens as well as by citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Eleventh Amendment immunity also extends to state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

■ Under a well-known exception to sovereign immunity, applied to the states through the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may bring suit against a state *official* for actions that either exceed the official's statutory authority or are unconstitutional. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689–91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Knight v. New York,* 443 F.2d 415, 419–420 (2d Cir.1971). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Va. Office for Prot. & Advocacy v. Stewart,* —— U.S. ——, 131 S.Ct. 1632, 1639, 179 L.Ed.2d 675 (2011) (quoting *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)). "But the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Maryland,* 535 U.S. at 646, 122 S.Ct. 1753. "An *allegation* of an ongoing violation of federal law ... is ordinarily sufficient." *Id.* (quoting *Idaho v. Coeur d'Alene,* 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)) (emphasis in original).

The Commissioner asserts Eleventh Amendment immunity with respect to Amtrak's claims regarding Parcels 105, 107, 108, 109, 110, and 111 that is, six of the seven Amtrak parcels at issue in this case, those that the NYSDOT purportedly acquired title to in February 2008 (hereinafter, the "condemned parcels"). She does not assert sovereign immunity with respect to Parcel 178, since the NYSDOT has not yet completed the acquisition process for that parcel under New York eminent domain law.

Amtrak argues that the *Ex parte Young* exception applies because it seeks prospective relief for an ongoing violation of federal law.

### A. Amtrak Does Not Allege an Ongoing Violation of Federal Law and the Relief It Seeks is Retrospective

■ Amtrak describes the relief it seeks as (1) a declaratory judgment that the NYSDOT Commissioner's completed taking of the Amtrak Bronx Rail Property was null and void because the state's eminent domain procedures were preempted by the Rail Act, the RPSA, the federal mortgage interest in Amtrak's property, and field preemption and (2) an order enjoining the NYSDOT Commissioner from

taking any actions in furtherance of the "void" takings, such as entering or building on the Amtrak Bronx Rail Property.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Virginia Office*, 131 S.Ct. at 1639 (quoting *Verizon Maryland*, 535 U.S. at 645, 122 S.Ct. 1753).

■ The "general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought." *Virginia Office*, 131 S.Ct. at 1639 (quoting *Pennhurst*, 465 U.S. at 107, 104 S.Ct. 900) (emphasis in original). The Supreme Court has held that the *Ex parte Young* doctrine does not apply when the "judgment sought would expend itself on the public treasury or domain, or interfere with public administration." *Pennhurst*, 465 U.S. at 101, n. 11, 104 S.Ct. 900 (internal quotations omitted).

■ The touchstone for determining whether certain relief is permissible under *Ex parte Young* is the prospective or retrospective nature of the relief sought. "The line between prospective and retrospective relief is drawn because 'Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'" *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir.2000) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)).

■ Accordingly, suits against states and their officials seeking damages or restitution for past injuries "are firmly foreclosed by the Eleventh Amendment." *Id;* see also *Mansour*, 474 U.S. at 73, 106 S.Ct. 423; *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Similarly, declaratory relief that relates solely to a past violation of federal law, and has the effect of imposing a monetary loss or requiring restitution by the state for a past breach of a legal duty, is barred by the Eleventh Amendment. *See Verizon*, 535 U.S. at 646, 122 S.Ct. 1753 (2002); *Mansour*, 474 U.S. 64, 106 S.Ct. 423 (1985). Though a plaintiff may frame the relief it seeks in prospective terms, if the effect of the relief sought is entirely retrospective, the suit does not fall within the *Ex parte Young* exception and is barred by the Eleventh Amendment. *Ward v. Thomas*, 207 F.3d at 119.

In *Edelman v. Jordan*, the Supreme Court first held that equitable restitution against the state or its officials, because it was retrospective in nature and would require payment from the State treasury, was impermissible under *Ex parte Young*.

In *Edelman*, the plaintiff in a class action suit, John Jordan, sued Illinois officials who were responsible for administering the federal-state programs of Aid to the Aged, Blind, or Disabled (AABD). *Edelman*, 415 U.S. at 653, 94 S.Ct. 1347. Jordan alleged that the program monies had been administered in a way that violated both federal laws and the Fourteenth Amendment. *Id.* at 655–56, 94 S.Ct. 1347. Specifically, Jordan claimed that the Illinois administrators were applying Illinois guidelines. *Id.* Those guidelines ignored the federal requirements that applications must be processed within 30 or 45 days, and that aid should be granted for prior eligibility months in which an applicant was entitled to aid under federal law, not just for the month in which an application

**230**

was approved. *Id.* The plaintiff's prayer requested declaratory and injunctive relief, and specifically requested "a permanent injunction enjoining the defendants to award to the entire class of plaintiffs all AABD benefits wrongfully withheld." *Id.* at 656, 94 S.Ct. 1347.

The district court issued a permanent injunction ordering the state officials to release and remit AABD benefits wrongfully withheld to all persons found eligible who had applied therefor between July 1, 1968, the date the federal regulations were issued, and April 16, 1971, the date of the court's preliminary injunction. *Id.* The Seventh Circuit Court of Appeals affirmed. *Id.* at 657, 94 S.Ct. 1347.

The Supreme Court reversed, holding that *Ex parte Young* barred the retroactive monetary award directed against the state officials, even though it was described as "equitable restitution." *Id.* at 665–66, 94 S.Ct. 1347. As a practical matter, the Court explained, the award could be satisfied only from the general revenues of the State and was indistinguishable from an award of damages against the State. *Id.* at 668, 94 S.Ct. 1347. The Court noted that it did not read *Ex parte Young* or subsequent holdings of the Court "to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled 'equitable' in nature." *Id.* at 666, 94 S.Ct. 1347. The Court made an important distinction that the relief sought by the plaintiff in *Edelman,* in contrast to what would be permissible injunctive relief, "required payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation." *Id.* at 668, 94 S.Ct. 1347.

In *Green v. Mansour,* the Supreme Court held that declaratory relief that related solely to a past violation of federal law and would have the effect of an award of damages against the state was barred by the Eleventh Amendment.

In *Mansour,* recipients of Aid to Families with Dependent Children ("AFDC") benefits challenged Michigan's calculation of benefits as violative of federal law. *Mansour,* 474 U.S. at 65, 106 S.Ct. 423. Before the merits of the recipients' claims were decided, Congress amended the law (and Michigan's policies conformed) in such a way that the plaintiffs had no remaining claim based on the calculation of present or future benefits. *Id.* The plaintiffs were left with a claim for a declaration that the state's past conduct violated federal law and a claim for "notice relief advising members of the plaintiff class that state administrative procedures were available by which they could receive a determination of whether they were entitled to past benefits." *Id.*

The *Mansour* Court found that the effect of the declaratory relief and notice relief sought would be entirely retrospective because the state was no longer violating federal law, and was therefore barred by the Eleventh Amendment. *Id.* at 71–73, 106 S.Ct. 423. The declaratory judgment that plaintiffs sought could be offered in state-court proceedings as res judicata on the issue of liability, and so it "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." *Id.* at 73, 106 S.Ct. 423. As in *Edelman,* the Court noted that the *Ex parte Young* exception was not available because there is no "claimed continuing violation of federal law" or "threat of state officials violating the repealed law in the future." *Id.* Additional-

ly, the Court found that "notice relief was unavailable where there was no continuing violation of federal law to enjoin." *Id.* at 71, 106 S.Ct. 423.

In contrast, the Supreme Court has allowed a suit for declaratory relief with respect to a *past* violation of federal law to stand against state officials where the declaration could affect only the past financial liability of private parties; the Supreme Court emphasized that no past liability of the State, or any of its commissioners, was at issue. *Verizon,* 535 U.S. at 646, 122 S.Ct. 1753.

Here, the takings, which occurred almost four years before Amtrak filed its complaint in this action, do not constitute an "ongoing violation of federal law." As demonstrated by the discussion *of Knight v. New York,* below, the state's appropriation of the property was completed in February 2008, when the commissioner formally effected the condemnation under Section 30 of the Highway Law. The asserted violation of federal law related to the taking is for a past violation, if any.

The relief that Amtrak seeks is clearly retrospective. The first form of relief sought is a declaration that something that happened years ago is null and void, and so really did not happen at all. That is not "prospective" relief. Even if the state's taking were unlawful, the *effect* of a declaration that the taking was null and void is wholly retrospective: in practical terms, such a declaration would require the state to give back the land, thereby restoring the status quo prior to the allegedly unlawful taking, which was over and done with back in February 2008. Since the taking was complete in 2008, there is no "ongoing violation of federal law" or "threat of state officials violating the [ ] law in the future." *Mansour,* 474 U.S. at 68, 106 S.Ct. 423. The relief requested is limited to the six condemned parcels in this case, and any

"threat" of those parcels being taken unlawfully has long passed; the Eleventh Amendment bar means that, even if the state's taking of those parcels *was* illegal, the retrospective relief that Amtrak now seeks is impermissible. *See id.* at 63, 106 S.Ct. 423. A declaratory judgment "is not available when the result would be a partial 'end run' around" the rule that *Ex parte Young* only permits suits for prospective relief. *Id.* at 73, 106 S.Ct. 423. Amtrak cannot surmount the Eleventh Amendment bar simply by framing the relief it seeks as a declaratory judgment; its claim clearly relates to a past purported violation of federal law and thus does not meet the *Ex parte Young* exception.

Amtrak also asserts that it is entitled to injunctive relief to prevent the Commissioner from entering or building upon the property. Amtrak argues that construction on the property could *further* interfere with federal laws or their purposes (under theories of express, implied, and field preemption)—including, *inter alia,* the rail "route" in the Northeast Corridor; Amtrak's duties to provide efficient rail service, minimize the effects of construction, and ensure safety and integrity of the rail line; and the federal mortgage interest in the property.

But any actions by the Commissioner to enter or build on the property do not constitute an "ongoing" violation of law, separate and apart from the taking itself. The taking occurred years ago. The taking has ongoing *effects,* to be sure, but a discrete act transferred record title from Amtrak to the Commissioner. Any use of the property by the state, its present record owner, is simply a by-product of the taking itself. To characterize this as "prospective" relief would permit Amtrak to challenge the state's taking at any point in the future—even decades after the appropriation—and surmount the Eleventh

Amendment bar. However, any such holding would obliterate the bar on retrospective relief created by the *Ex parte Young* doctrine and render a state liable for *past* violations of federal law, which is constitutionally impossible.

The Second Circuit's holding in *Knight v. New York*, 443 F.2d 415 (2d Cir.1971) controls here. In *Knight*, plaintiff filed suit in federal court against the State of New York, alleging that the commissioner's taking of his property for the state under Section 30 of the Highway Law was unlawful because it was not "for a public purpose," and seeking declaratory and injunctive relief to set aside the appropriation. *Knight*, 443 F.2d at 417. The court dismissed the suit against the state and denied the plaintiff's request for leave to amend so that the suit might proceed against the commissioner of transportation.

With respect to suit against the commissioner, the court explained that, under the doctrine *of Ex parte Young*, it was clear that Knight "could have sued for an injunction in the federal courts, in advance of the taking, to restrain the commissioner from effecting the appropriation on the ground that this was not for a public use, although the court might perhaps have abstained if state proceedings would afford adequate relief." *Id.* at 419. But the court concluded that because title to the disputed lands had "vest[ed] in the State immediately upon the filing of a description and map of the property" at the clerk's office, pursuant to Section 30 of the Highway Law, Knight's request for a decree against the commissioner would require "affirmative action" on the part of the State to return the property, and was thus barred by the Eleventh Amendment. *Id.* at 419–21.

The same is true here. *Knight* involved the same Section 30 of the Highway Law that is at issue in this case. Pursuant to that section, title to the Amtrak parcels (except for Parcel 178) vested in the state on February 19, 2008, when the Commissioner filed the necessary appropriation documents with the clerk's office. This renders the relief that Amtrak now seeks—a declaration that the takings are null and void—"retroactive." The *Ex parte Young* exception is inapplicable, because the appropriation was complete back in 2008, so there is no "ongoing violation of federal law." Amtrak's request for an order enjoining the State from doing anything with the condemned property does not alter this result because any prospective relief would only be a by-product of the retrospective relief that this Court cannot now give.

Amtrak argues that *Knight* is no longer good law because it relied on authority of questionable validity—namely, a footnote in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). I disagree.

At the time that *Knight* was decided, the Supreme Court had not yet articulated the *Edelman v. Jordan* exception to *Ex parte Young*, which limits the exception to claims seeking prospective relief. In *Knight*, the Second Circuit relied on a different exception to sovereign immunity, set out in *Larson*, where the Supreme Court ruled that suits are permitted against government officials for actions that either exceeded the officials' statutory authority or were unconstitutional. *Larson*, 337 U.S. at 689–91, 69 S.Ct. 1457; *see also Knight*, 443 F.2d at 419–420 (2d Cir.1971). *Larson* concerned a federal official, but the rule applies equally to state officials. *See, e.g., Knight*, 443 F.2d at 419–20; *Dean v. Abrams*, No. 94 Civ. 3704(LAK), 1995 WL 791966, at *2 n. 5 (S.D.N.Y. Dec. 26, 1995). The *Larson* Court, however, qualified its holding in a now infamous footnote—the

subject of much discourse by courts and commentators—writing, "Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." *Larson*, 337 U.S. at 691, n. 11, 69 S.Ct. 1457. The *Knight* court relied on this footnote when it found that the plaintiff's suit was barred by the Eleventh Amendment, because the relief sought the return of property to Knight after title had already vested in the state—would require "affirmative action" on the part of the state. *Knight*, 443 F.2d at 419–21.

*Knight* remains good law in this Circuit. In fact, *Knight* addressed the continuing vitality of the *Larson* footnote in the face of subsequent Supreme Court case law, and concluded that, absent further guidance from the Supreme Court, *Larson* precluded relief requiring "affirmative action" by the state. *Id.* at 420–21. While other circuits have concluded that *Larson* does not preclude *all* suits for affirmative relief in the name of sovereign immunity, *see Washington v. Udall*, 417 F.2d 1310, 1318 (9th Cir.1969), *W. Coast Exploration Co. v. McKay*, 213 F.2d 582, 584–85 (D.C.Cir. 1954), the decision in *Knight* is clear that at least in this Circuit *Larson* precludes claims that a state taking is unconstitutional where that claim is brought *after* the taking has been effected.

Since *Knight*, courts in this Circuit have repeatedly affirmed that it remains binding precedent. As recently as 2005, the Second Circuit reaffirmed the holding in *Knight* that *Larson* "precluded a federal court from ordering affirmative action by either the state or federal government em-

ployees in their official capacities," while noting that, under subsequent guidance provided by the Supreme Court in *Edelman*, it would not bar "an order directing government officials to reinstate either [government] benefits or employment." *Dotson v. Griesa*, 398 F.3d 156, 177 n. 16 (2d Cir.2005).

Moreover, in affirming *Knight*, courts in this Circuit have also relied on it for the proposition that the return of property taken by the state is barred by the Eleventh Amendment because that constitutes "retrospective" relief. *See McAuliffe v. Carlson*, 520 F.2d 1305–08 (2d Cir.1975); *Dean v. Abrams*, No. 94 Civ. 3704(LAK), 1995 WL 791966, at *2 n. 5 (S.D.N.Y. Dec. 26, 1995).

In *McAuliffe v. Carlson*, the plaintiff sought declaratory relief holding certain Connecticut statutes unconstitutional and ordering moneys taken from the plaintiff by a state official returned to him. *McAuliffe*, 520 F.2d at 1306. Pursuant to two Connecticut statutes, the defendant had taken funds belonging to the plaintiff— social security benefits and money deposited in one of the plaintiff's hospital accounts—and used the money to pay for the costs of plaintiff's hospitalization in Connecticut mental health facilities. *Id.* at 1306–07.

The district court rendered a declaratory judgment that the Connecticut statutes authorizing defendant's actions were unconstitutional, but expressly reserved the question of whether the Eleventh Amendment barred a claim for restitution if Connecticut refused to return the moneys to the plaintiff. *Id.* at 1307. When Connecticut refused to return the property, the district court judge issued a supplementary decision ordering Connecticut to return the property, based on the official's fiduciary obligations under Connecticut law. *Id.*

The Second Circuit reversed the supplementary decision because ordering the defendant to return the money amounted to "equitable restitution" against the State and, under *Edelman*, "Equitable restitution is, in practical effect, indistinguishable from an award of damages against the state"—and thus impermissible under the Eleventh Amendment. *Id.* The court cited *Knight* approvingly, writing that "Even in those cases where the claim is that a state has illegally taken or used plaintiff's property, not merely wrongfully withheld it, the Eleventh Amendment applies with full force; and neither the means of obtaining such funds nor the formalities of the manner in which they are held limits the scope of the Eleventh Amendment rejection of federal power." *Id.*

The court noted the exception to the Eleventh Amendment bar for prospective relief, but found that the payment ordered was not "ancillary to prospective relief." *Id.* Under *Edelman*, the order was barred by the Eleventh Amendment because it required "the state to make a payment in restitution of a past wrong from the state treasury. Whether the payment is called damages, retroactive payment, or restitution, the effect upon the fisc is the same." *Id.*

 More recently, in *Jones v. Newman*, No. 98 Civ. 74600(MBM), 1999 WL 493429 (S.D.N.Y. June 30, 1999), the district court discussed in detail *Knight* and the continuing vitality of the *Larson* footnote, reviewing many of the same cases discussed in *Knight*, and concluded that, "at least within the Second Circuit, sovereign immunity applies even to constitutional claims if the requested relief requires affirmative action by the sovereign." *Jones*, 1999 WL 493429, at *8–9.

In *Jones*, a *pro se* litigant sued several Second Circuit judges and District Court Judge Scheindlin, alleging due process violations related to Judge Scheindlin's dismissal of two of the plaintiff's complaints and the Second Circuit's affirmance of those dismissals. *Id.* at *4–5. Applying the "affirmative action" test outlined in *Larson*, Judge Mukasey held sovereign immunity did not bar injunctive relief "prohibiting and restraining" defendants "or any other judge of the United States" from violating various constitutional rights of plaintiff "or of any other pro se litigant," or a declaratory judgment that Judge Scheindlin's two opinions and the Second Circuit's affirmance thereof are "constitutionally invalid and void." *Id.* at *10.

The court found, however, that "equitable relief restoring . . . to the civil docket" those claims that were dismissed by Judge Scheindlin "in violation of plaintiff's right to due process," would require affirmative action by the sovereign and were prohibited under *Larson*, *Id.*, "In contrast, the first form of requested relief can be granted 'by merely ordering the cessation of the conduct complained of,' *Larson*, 337 U.S. at 691 n. 11, 69 S.Ct. 1457, and the second form of requested relief would require only a declaration of rights." *Id.* (citing *Alan Guttmacher Institute v. McPherson*, 597 F.Supp. 1530, 1539 (S.D.N.Y.1984) (stating that suits for declaratory relief are "permitted under *Larson*")).

It bears noting that the declaratory relief sought by Amtrak is distinct from that sought in *Jones*: a declaration that the state's taking of Amtrak property is "null and void" would require the "return" of that property to Amtrak. The ultimate *effect* of that declaration would be restitution for the allegedly unlawful taking, which is squarely impermissible under the *Ex parte Young* exception because of its effect on the state fisc (which includes property owned by the state) to right a purported *past* violation of federal law. Notably, in *Jones*, Judge Mukasey deter-

mined that equitable relief restoring the plaintiff's case to the civil docket analogous here to relief requiring the return of property to Amtrak—was barred by sovereign immunity because it would require "affirmative action." *See id.*

In *Dean v. Abrams,* the court noted that to the extent the *pro se* plaintiff, Dean, sought to sue the former attorney general of the State of New York in his official capacity for unconstitutionally seizing her personal property, among other things, the "Eleventh Amendment protects state officials acting in their official capacities from suits in federal courts for past wrongs." *Dean,* 1995 WL 791966, at *2 n. 5. Relying on *Knight,* the court wrote that the "only exception to the Eleventh Amendment's protection is for 'prospective injunctive relief,' but Dean's demand ... for the return of her property does not qualify for this exception." *Id.*

*State Employees Bargaining Agent Coalition v. Rowland,* 494 F.3d 71 (2d Cir. 2007) did not overrule *Knight,* as Amtrak contends. In *State Employees,* the Second Circuit relied on its earlier position in *Dotson*—and the position of every other circuit to consider the issue—that reinstatement to previous employment satisfies the *Ex parte Young* exception, and then extended the exception to apply to cases where the state had eliminated the employment positions. *State Employees,* 494 F.3d at 96. The court explained that the elimination of the plaintiffs' positions did nothing to extinguish their right to state employment, making the relief they sought—being rehired into some position and compensating them for work performed in the course of their *future* employment—prospective. *Id.* at 97–98. In contrast, the Second Circuit has held, in *Knight,* that title to property vests in the state upon its filing of the necessary appropriation documents, the ones that extin-

guish a prior owner's right to that property; *State Employees,* a decision limited in its scope to claims for employment reinstatement, does nothing to change this.

 Whether the relief sought in *Knight* is described as requiring "affirmative action" under the test described in *Larson,* or as "retroactive relief under the articulation of the *Ex parte Young* exception after *Edelman*—a matter of semantics more than anything, in this case—*Knight* stands for the proposition that, once title to a property has vested in the state, an action against a state official for the return of that property is barred by the Eleventh Amendment.

Here, because title has already vested in the state, it is too late to challenge the taking. Hence, Amtrak's claims with respect to the parcels that have already been condemned pursuant to state law are barred by the Eleventh Amendment.

## B. Amtrak's Supremacy Clause Claim Does Not Permit an End Run Around the Eleventh Amendment Bar

To get around *Knight,* Amtrak argues that the Supremacy Clause renders the Commissioner's taking "null and void," so it is as if the takings never happened. Amtrak urges that this makes the relief it seeks prospective rather than restrospective.

## 1. The Eleventh Amendment Prevents Courts From Granting Retrospective Relief Against State Officials for Federal Preemption Claims

In order to argue that the taking is "null and void," Amtrak relies upon the basic principle of federal preemption that all state provisions that conflict with federal law are "without effect" or, in other words, that a "state statute is void to the extent it conflicts with a federal statute." *Mary-*

*land v. Louisiana,* 451 U.S. 725, 746, 747, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). On that basis, Amtrak claims that New York state eminent domain law, as applied to property owned by Amtrak, is "null and void" because it is preempted by the RPSA, the Rail Act, and the federal mortgage interest in the property. As the argument runs, the taking never happened, and the declaratory relief that Amtrak now seeks cannot be characterized as "retrospective."

■ The principle that a state statute is "null and void" in the face of conflicting federal law says nothing about whether relief can be granted against the State or its officials with respect to past violations of federal law. It certainly does not stand for the proposition, as Amtrak appears to contend, that when a state statute conflicts with federal law, relief will necessarily be available for *past* injuries as though the state law never existed. That would flatly contradict the Eleventh Amendment and the *Ex parte Young* doctrine. The Supreme Court has clearly stated that "the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause," but retroactive relief for Supremacy Clause claims, like Amtrak's claims here, will not be awarded because "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Mansour,* 474 U.S. at 68, 106 S.Ct. 423.

■ In other words, there is no dispute that, under *Young,* the court may determine that an unconstitutional statute is "void" and "that the Eleventh Amendment does not prevent federal courts from granting *prospective* [ ] relief to prevent a continuing violation of federal law." *Id.* (emphasis added). But even where an enactment is void, declaratory relief that is solely related to a past violation of federal

law will not be granted. *See id.* at 68, 71–73, 106 S.Ct. 423.

All of the cases that Amtrak cites in support of its argument here are inapposite. In two of the cases the defendants were municipalities, which are not protected by the Eleventh Amendment. *See 23–34 94th St. Grocery Corp. v. New York City Bd. Of Health,* 685 F.3d 174, 185–86 (2d Cir.2012); *Lucas v. Planning Bd. Of Town of LaGrange,* 7 F.Supp.2d 310, 322 (S.D.N.Y.1998). And while *Clean Air Markets Group v. Pataki,* 338 F.3d 82 (2d Cir.2003) held that the New York Air Pollution Mitigation Law was "nullified" because it was preempted by the Clean Air Act, the issue of sovereign immunity never came up, and the case did not address the availability of retrospective relief against the State or its officers.

## 2. The Supremacy Clause Claim Does Not Render *Knight* Irrelevant

Amtrak also argues that, even if *Knight* remains good law, it does not dictate the result in this instance because *Knight* did not involve a Supremacy Clause claim. It relies on *In re New York, New Haven & Hartford Railroad Company,* 447 F.2d 428 (2d Cir.1971) and *Blanchette v. State of New York,* 412 F.Supp. 219 (S.D.N.Y.1976) to argue that a successful Supremacy Clause claim would render the state taking "null and void," rendering relief retroactive rather than prospective—i.e., the State would not be required to take "affirmative action" to "return" the property because it never acquired good title in the first place.

Amtrak is wrong.

In *New York, New Haven* and *Blanchette,* the courts each held that, pursuant to the Supremacy Clause, a bankruptcy court order enjoining all persons from interfering with the property of a debtor railroad preempted the City of New York (in the case of *New York, New Haven* ) or

the State (in the case of *Blanchette*) from condemning such property. As a result, appropriations purportedly effected after the bankruptcy court entered its order were null and void. *New York, New Haven*, 447 F.2d at 431; *Blanchette*, 412 F.Supp. at 221–22.

No sovereign immunity issue was raised in *New York, New Haven*. But in *Blanchette*, the state officials argued, as the Commissioner does here, that they were immune from suit under the Eleventh Amendment. *Blanchette*, 412 F.Supp. at 221–22. The district court relied on *Knight* to reject the officials' argument, noting the Second Circuit's observation that an action enjoining the state officer *prior to the taking* could have been maintained against the state official under the *Ex parte Young* exception. *Id.* at 222. The district court concluded that because "such an injunction, ordered by the reorganization court, had already issued … no title ever vested in the State," and the purported condemnation was "null and void." *Id.*

In Amtrak's case, no such injunction was issued before the takings were completed pursuant to the EDPL and the Highway Law. In *New York, New Haven* and *Blanchette*, the bankruptcy injunction specifically enjoined any action by anyone (including by the state) to take the debtor railroad's property. Had Amtrak—which was aware of EDPL proceedings as early as May 2005—come to this Court to enjoin any taking on Supremacy Clause preemption grounds before it took place, this Court could and would have entertained the claims and enjoined eminent domain if Amtrak's argument was right. But Amtrak chose to let the takings process play itself out, and only then assert that its property was not subject to eminent domain in the first place.

Amtrak argues that the Rail Act and the RPSA, the orders of the Special Court regarding the transfer of the rail property to Amtrak, and the federal mortgage interest in the property all preempt the NYS-DOT Commissioner's acts to take the Amtrak Bronx Rail Property. Amtrak makes a passing reference to a provision of the Rail Act that states that certain kinds of orders of the Special Court "shall be final and shall not be restrained or enjoined by any court," in order to analogize the conveyance order for the Amtrak Bronx Rail Property to an injunction. 45 U.S.C. § 719(e)(2); (Pl.'s Opp'n at 27, n. 21.) But that provision does not even apply to the conveyance orders themselves, which are governed by an entirely separate provision of the Rail Act, 45 U.S.C. § 743(b), and which states nothing of the sort. The laws and orders that Amtrak cites do not enjoin or prohibit anything, let alone specifically enjoin or prohibit eminent domain proceedings, as was true in *New York, New Haven* and *Blanchette*. The injunctions in those cases were specific orders of a court that prohibited something from occurring *ex ante;* as a result, any outcome of proceedings conducted in violation of the injunction was necessarily "null and void." In contrast, the preemption claim now brought by Amtrak is being litigated *ex post facto*. While Amtrak's arguments might have prevailed if made before anything happened, Amtrak failed to make them.

The limitations on the *Ex parte Young* exception, as explained above, mean that even if a state statute is void because it is in conflict with a federal statute, retroactive relief against the state or its officers is prohibited by the Eleventh Amendment. That is the case here: while Amtrak alleges that the taking of Amtrak's property violated the Supremacy Clause, the taking has already been completed and any relief against the state would be retroactive.

Amtrak was free to bring an action to enjoin the State's condemnation proceedings *before* the taking was accomplished under state law, but it did not do so. Its claims with respect to the already condemned parcels are barred by the Eleventh Amendment.

### III. The Court Should Not Rely on *Younger* Abstention to Avoid Deciding Amtrak's Claims With Respect to Parcel 178

 Amtrak also seeks relief with respect to Parcel 178, as to which title has not yet vested in the state. Defendant argues that this Court should abstain from deciding that claim.

 In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court established the principle that federal courts generally should not enjoin or interfere with ongoing state court proceedings. *Younger* held, specifically, that a federal court may not enjoin pending state court criminal proceedings absent bad faith, harassment or other unusual circumstances calling for equitable relief.

 In *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), the Court extended the reasoning of *Younger* to state administrative proceedings. Abstention from the exercise of federal jurisdiction, however, remains the narrow exception, not the rule. *CECOS Int'l, Inc. v. Jorling,* 895 F.2d 66 (2d Cir.1990). Thus, in order to justify abstention on *Younger* grounds in non-criminal proceedings, *Middlesex* holds that courts must first answer three questions affirmatively: (1) whether the administrative proceedings constitute ongoing state judicial proceedings; (2) whether the state proceedings implicate important state interests; and (3) whether state procedures are available

that allow the plaintiff to raise his federal claim in state court. *Middlesex,* 457 U.S. at 432, 102 S.Ct. 2515. If the answer to all three questions is "yes," a district court must abstain unless the state proceeding was commenced in bad faith or was filed for the purpose of harassing the plaintiff, or if other unusual circumstances warrant the court's intervention. *See id.* at 435, 102 S.Ct. 2515. If the answer to any one of the questions is "no," however, the district court should not abstain from exercising federal jurisdiction. *Id.* at 432, 102 S.Ct. 2515; *CECOS Int'l,* 895 F.2d at 70–71.

 Similarly, a district court should not abstain "where a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass." *Cullen v. Fliegner,* 18 F.3d 96, 103–04 (2d Cir.1994), *cert. denied sub nom.,* 513 U.S. 985, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994). "In such cases, a showing of retaliatory or bad faith prosecution establishes irreparable injury for the purposes of the Younger doctrine, and the expectations for success of the party bringing the action need not be relevant." *Id.* (citations omitted). To warrant abstention, it is imperative that the ongoing state proceedings be "judicial in nature." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (*"NOPSI"*).

 New York eminent domain proceedings always satisfy the second prong of *Younger* because they implicate important state interests. *Didden v. Village of Port Chester,* 304 F.Supp.2d 548, 564 (2004); *Broadway 41st Street Realty Corp. v. The New York State Urban Development Corp.,* 733 F.Supp. 735, 740–42

(S.D.N.Y.1990). And Amtrak does not claim that any of the proceedings conducted pursuant to the New York EDPL have been brought in bad faith or for the purpose to harass. Accordingly, in order to justify abstention on *Younger* grounds, the Court must find that (1) there is an ongoing state judicial proceeding with respect to Parcel 178 and (2) Amtrak had an adequate opportunity to raise its federal claims in the eminent domain proceedings with respect to Parcel 178. Because I find that there is no ongoing state judicial proceeding with respect to Parcel 178, I do not address whether Amtrak had an adequate opportunity to raise its federal claims in state court.

For the purposes of context, a brief summary of the eminent domain proceedings precedes the Court's analysis.

## A. The Eminent Domain Procedure Law (EDPL)

The purpose of the EDPL is to regulate the procedure for condemnation of private property. The EDPL sets forth a staged process for addressing the various issues that arise during a condemnation—each stage being the subject of its own section (article) of the EDPL.

The Article 2 phase conclusively determines the need and location of a public project. Article 2 requires the condemnor of a property to conduct a public hearing upon public notice. EDPL §§ 202–203. Thereafter, any person in attendance has the opportunity to present an oral or written statement and to submit other documents concerning the proposed public project. EDPL § 203. Following the public hearing, the condemnor must issue a determination and findings, which must be published. EDPL § 204. Aggrieved persons may then seek judicial review in the Appellate Division by filing a petition within thirty (30) days after the completion and publication of the determination and finding. EDPL § 207.

The scope of review under EDPL § 207 includes whether (1) the proceeding was in conformity with the federal and state constitutions; (2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority; (3) the condemnor's determination and findings were made in accordance with the statutory procedures; and (4) the public use, benefit or purpose will be served by the proposed acquisition. EDPL § 207(C). Later judicial review is precluded as to "any matter which was or could have been determined" by the Appellate Division, including a non-public use claim. EDPL § 208.

Article 3 controls the making of compensation offers for property that has been determined to be subject to condemnation for a public purpose.

Following an Article 2 determination and finding and an Article 3 negotiation or offer, the condemnor may commence proceedings to acquire the necessary property under Article 4. EDPL § 401. Article 4 proceedings are commenced when a petition is filed in the Supreme Court, served by registered or certified mail upon property owners and published. The petition must allege compliance with the provisions of Article 2; it need not allege compliance with Article 3. EDPL § 402. Property owners are permitted to appear and interpose a verified answer, which must specifically deny each material allegation controverted by the owners, and which may allege "new matters constituting a defense to the proceeding." The Court may grant the petition upon "proof to its satisfaction" that the procedural requirements of the law have been met. EDPL § 402(b)(5). Upon filing notices of appropriation and a certified copy of an acquisition map of the property in the office of the county clerk in which the

property is situated the acquisition is "deemed complete and title to such property shall be vested in the state." *See* EDPL § 402(A). Thus, Article 4 effects the taking of the property.

If, after title passes, the amount to be paid for the property remains in dispute, compensation is adjudicated in the Court of Claim pursuant to Article 5.

## B. *Younger* Abstention Is Not Appropriate in This Case

The condemnation process with respect to Parcel 178 is stalled just after the Article 2 stage. As required by section 201 of the EDPL, the NYSDOT held a public hearing regarding the public project on May 17, 2005, which addressed the potential condemnation of all of the Amtrak parcels at issue in this case, including Parcel 178. Pursuant to section 204, the State issued its Determination and Findings on August 17, 2005, and published those findings in the New York *Daily News* on August 19, 2005. Pursuant to section 207, Amtrak had thirty days after the Determination and Findings were published to appeal those findings in the Appellate Division; Amtrak did not do so.

The publication of the Determination and Findings was the last action taken with respect to Parcel 178 under the EDPL. While the Commissioner subsequently completed her acquisition of the other six Amtrak parcels pursuant to Articles 3 and 4 of the EDPL, she has yet to initiate a Condemnation Proceeding under Article 4 with respect to Parcel 178 in order to transfer title of the property to the state.

Section 401(C) of the EDPL gives the Commissioner ten years from the publication date to commence proceedings pursuant to Article 4—in order to effect the taking of the property—with respect to "property that is to be acquired for a public project in stages," so long as the condemnation of property for the "first stage" was commenced within three years. There is no requirement that any additional public hearings be held; the initial hearing suffices. EDPL § 401(C). Since the proceedings with respect to the first stage of the project—including the six condemned Amtrak parcels at issue in this case—were commenced within three years of the public hearing, the Commissioner has until August 2015 to commence eminent domain proceedings under Article 4 with respect to Parcel 178.

At present, then, there is no "ongoing state judicial proceeding" with respect to Parcel 178. Amtrak did not commence a section 207 proceeding in the Appellate Division to appeal the determination and findings, and the time to do so has expired. While the Commissioner has ten years to commence an Article 4 proceeding to condemn Parcel 178, "that future action does not justify a refusal to assume jurisdiction under *Younger*." *Goldstein v. Pataki*, No. 06 Civ. 5827(NGG)(RML), 2007 WL 1695573, at *14 (E.D.N.Y. Feb. 23, 2007), *report and recommendation adopted in part, rejected on other grounds*, 488 F.Supp.2d 254 (E.D.N.Y.2007) *aff'd*, 516 F.3d 50 (2d Cir.2008). As the Second Circuit has held, "A federal court need not stay its jurisdictional hand when there is no state action pending at the time the federal suit is filed, even if there is a substantial likelihood that a state proceeding will be instituted in the future to vindicate the state's interests." *Cecos Int'l*, 895 F.2d at 72.

Several courts have found that an Article 4 condemnation proceeding constitutes an "ongoing judicial proceeding" for the purposes of *Younger* abstention. In *Broadway 41st*, Judge Leisure concluded that an Article 4 proceeding under the EDPL was "judicial in nature," making

*Younger* abstention appropriate when such a proceeding was pending at the time the federal suit was filed. *Broadway 41st,* 733 F.Supp. at 740–42. In *Didden,* this Court was also faced with claims brought by plaintiffs while an Article 4 condemnation proceeding was pending, and agreed with Judge Leisure's conclusion that an Article 4 proceeding is "judicial in nature." *Didden,* 304 F.Supp.2d at 564. No such proceeding is pending in the instant case.

The Commissioner argues, however, that because "the five stages of EDPL constitute a single, unitary proceeding," *Didden,* 304 F.Supp.2d at 564, so long as Parcel 178 is at some stage in that process, there is an "ongoing proceeding" for the purposes of *Younger,* and the Court should abstain from adjudicating Amtrak's claims. This is incorrect.

In *Broadway 41st,* Judge Leisure wrote that he viewed "the state court condemnation proceedings as one unified judicial proceeding which fully provides plaintiffs with the opportunity to raise their federal constitutional claims, albeit at different stages in the proceeding." *Broadway 41st,* 733 F.Supp. at 743. In that case, the plaintiffs claimed that they did not have an adequate opportunity to raise their challenges to just compensation in the pending Article 4 proceeding. *Id.* at 742–44. Judge Leisure found that, since the plaintiffs would have such an opportunity before a state court at the Article 5 stage of the EDPL, and the condemnation process under the EDPL could be viewed as unitary, they did indeed have an adequate opportunity to raise their federal claims. *Id.*

This Court reasoned the same in *Didden.* In that case, the plaintiffs brought their federal court action while the Article 4 proceeding was still pending, claiming that the prospective condemnation violated the Takings Clause of the Constitution be-

cause there was no public purpose for the project. *Didden,* 304 F.Supp.2d at 557. This Court concluded that even though the plaintiffs had already waived their rights under the EDPL to challenge the condemnation in state court—because they (like Amtrak) had failed to appeal the "determination and findings" within thirty days of their publication, under section 207—they had an adequate opportunity to raise such a claim as part of the Article 2 stage of the EDPL, which was specifically designed to address, *inter alia,* constitutional claims. *Id.* at 565–66; *see also* EDPL § 207. The fact that they had failed to do so during that stage made no difference, because the five stages of the EDPL could be viewed as a "single, unitary proceeding." *Id.*

But in both of these cases there was, at the moment the federal court was asked to intervene, an *ongoing* proceeding in state court that was "judicial in nature." If the district courts had not abstained, it would have interfered directly with those ongoing proceedings.

Here, there was not *any* "ongoing" state court proceeding at the time Amtrak filed its federal complaint, and certainly not a proceeding that was "judicial in nature." This case is analogous to *Goldstein v. Pataki,* 488 F.Supp.2d 254, 278 (S.D.N.Y. 2007), in which Judge Garaufis, adopting the recommendation of the magistrate judge, declined to abstain under the *Younger* doctrine with respect to a case in the same procedural posture as this one. In *Goldstein,* the plaintiffs had failed to challenge the condemnor's determination and findings pursuant to section 207 of the EDPL, and the time to do so had expired. *Goldstein,* 2007 WL 1695573, at *14. The condemnor, however, had not yet initiated proceedings under Article 4 to condemn the property. *Id.* The court concluded that, because there was no "ongoing" judi-

cial proceeding, *Younger* abstention was inappropriate. *Id.*

I conclude the same. The EDPL is indeed a "unitary process." However, at this moment, its judicial aspect is in suspense (and it has been for many years). There is neither a court proceeding nor an administrative proceeding currently pending, and since there is no certainty that the State will initiate a Condemnation Proceeding under Article 4, it cannot be said that there is at present *any* "ongoing" proceeding.

Therefore, this Court's consideration of Amtrak's claims would not interfere directly with any pending state judicial proceeding, and *Younger* abstention is inappropriate.

### IV. Amtrak's Claims With Respect to Parcel 178 Are Precluded on Statute of Limitations Grounds

■ Amtrak's claims with respect to Parcel 178 must be dismissed because they are time-barred.[1]

■ Where Congress has not provided a specific statute of limitations period for a federal cause of action, "the applicable limitations period ... is that specified in the most nearly analogous limitations statute of the forum state." *Muto v. CBS Corp.*, 668 F.3d 53, 57 (2d Cir.2012) (internal quotations omitted). This general rule applies equally to claims brought pursuant to the Supremacy Clause, like Amtrak's federal preemption claims here. *See, e.g., Niagara Mohawk Power Corp. v. F.E.R.C.*, 162 F.Supp.2d 107, 137 (N.D.N.Y.2001), *aff'd but criticized on other grounds sub nom., Niagara Mohawk*

*Power Corp. v. Fed. Energy Regulatory Comm'n*, 306 F.3d 1264 (2d Cir.2002).

■ Courts in this Circuit have held that the applicable statute of limitations for claims brought pursuant to the Supremacy Clause in New York is six years, applying the catch-all provision of the C.P.L.R., section 213(1), for "an action for which no limitation is specifically prescribed by law." *Kenmore Mercy Hosp. v. Daines*, 09–CV–162S, 2011 WL 4368564, at *3 (W.D.N.Y. Sept. 19, 2011); *Niagara Mohawk Power Corp. v. F.E.R.C.*, 162 F.Supp.2d 107, 137 (N.D.N.Y.2001) (constitutionality of government conduct governed by six-year statute of limitations provided by C.P.L.R. § 213(1)); *see also Nextel of New York, Inc. v. City of Mount Vernon*, 361 F.Supp.2d 336, 340 (S.D.N.Y. 2005).

The Commissioner argues that the most nearly analogous limitations statute is section 207 of the EDPL, which gives a thirty-day filing period after the condemnor issues its determination and findings to appeal the findings. Since Amtrak's claims are time-barred under either period and it makes no difference to the analysis, the Court applies the six-year statute of limitations.

■ A federal claim accrues when the plaintiff "knows or has reason to know of the injury that is the basis of the action." *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir.2003). As the Second Circuit found, affirming this Court's determination in *Didden* that the plaintiffs' claims were barred by the statute of limitations in that case, a plaintiff's claims challenging the condemnation of its property under the EDPL accrue when the

---

1. And if the Eleventh Amendment did not act as a bar to Amtrak's claims with respect to the condemned parcels, they too would be precluded for the same reasons articulated below. Statute of limitations is, therefore, an alternative rationale for granting the Commissioner's motion with respect to those parcels.

condemnor issues its determination and findings. *Didden,* 173 Fed.Appx. at 933; *accord* 322 F.Supp.2d at 388, 304 F.Supp.2d at 558; *see also Goldstein,* 2007 WL 1695573, at *12–13 (applying the reasoning of *Didden* to find that the plaintiffs' claims were ripe for judicial review once the condemnor's determination and findings were issued pursuant to the EDPL). In *Didden,* because the plaintiffs had notice of the public hearing, this Court found that they were "fully aware that a finding of public purpose would expose their property to the prospect of condemnation," and thus indisputably "had reason to know of the basis of [its] injury" on the date the determination and findings were published. *Didden,* 322 F.Supp.2d at 389, *aff'd* 173 Fed.Appx. at 933, 304 F.Supp.2d at 558.

Amtrak claims that it did not receive proper notice of the public hearing pursuant to Section 202(C) of the EDPL, which requires that property owners be notified of a public hearing related to the planned taking through "personal service or certified mail, return receipt requested," at least ten but no more than thirty days prior to the hearing. *See* EDPL § 202(C)(1, 2). It also claims that it did not receive proper notice of the public hearing under federal law, because section 24301(b) of the RPSA states that Amtrak shall "accept service of process … addressed to the secretary of Amtrak at its principal office and place of business," and Amtrak did not receive such notice at its principal office located in the District of Columbia.

But for statute of limitation purposes it makes no difference if notice was defective under the EDPL or the RPSA. It is undisputed that Amtrak had *actual* notice of the public hearing, which was held on May 19, 2005, before it happened, which gave Amtrak reason to know that it had a claim.

Amtrak claims to have no record of the notice letter sent by the Commissioner on May 2, 2005, and asserts that it was sent to the wrong address. But it is an undisputed fact that Amtrak officials were aware of the hearing at the latest by May 12, 2005, and likely earlier. During the week of May 2, 2005, Mr. Weld of NYS-DOT left a message for Mr. Watson of Amtrak—whom he had already been communicating with for several years regarding the Bronx River Greenway project—informing Mr. Watson about the upcoming hearing. On May 11, 2005, Mr. Weld sent a follow-up email to Mr. Watson providing additional notice of the hearing. The next day, on May 12, 2005, Mr. Watson replied to Mr. Weld's email, acknowledging that he had notice of the hearing and copying various other officials at Amtrak, including Amtrak's in-house counsel.

Therefore, Amtrak knew about the NYSDOT's public hearing regarding the condemnation at the latest by May 12, 2005, and the Determination and Findings were published in the New York *Daily News* on August 19, 2005. Thus, Amtrak "had reason to know of the basis of [its] injury" no later than August 19, 2005, and its claims accrued at that time. Amtrak did not commence this action until April 9, 2012—well over six and a half years after the NYSDOT issued and published its Determination and Findings. Under settled law, Amtrak's claims are too late.

It makes no difference that, in *Didden,* the plaintiffs challenged the condemnation on the grounds that there was no public purpose, and here, Amtrak brings a Supremacy Clause claim. Under the reasoning of *Didden,* Amtrak was "fully aware that a finding of public purpose would expose [its] property to the prospect of condemnation." *Didden,* 322 F.Supp.2d at 389, *aff'd* 173 Fed.Appx. at 933. Indeed, the EDPL provides that Amtrak's time to

challenge the proposed takings—under state law, that is—on the grounds of federal preemption began to run on the date the Determination and Findings were published. *See* EDPL § 207. Amtrak indisputably had notice of the publication of the Determination and Findings—those findings were published in the local newspaper as required by the EDPL, and Amtrak had actual notice of the public hearing that would lead to those findings, and the Bronx River Greenway project months earlier (in fact, it had notice of the project itself years earlier). The Determination and Findings specifically informed the reader that under sections 207 and 208 of the EDPL, "the exclusive venue for review of judicial [*sic*] of the condemnor's determination and findings is the appellate division in the judicial department where any part of the property to be condemned is located." (Taylor Decl. Ex. 24.) Since section 207 outlined the scope of review for challenging the condemnation in the Appellate Division, including on the basis that the State did not have the authority to condemn the property, Amtrak indisputably "had reason to know of the basis of [its] injury." 322 F.Supp.2d at 389, *aff'd* 173 Fed.Appx at 933, 304 F.Supp.2d at 558.

In fact, it can be argued that Amtrak had *actual knowledge* of the potential for injury much earlier. Amtrak officials had been in contact with NYSDOT officials for several years before the public hearing was held, and had communicated to the NYSDOT that they believed the condemnation of the Amtrak Bronx Rail Property would violate federal law. (*See* Pl.'s 56.1 Stm't ¶¶ 43–47; Def.'s Counterst. ¶¶ 43–47.) Thus, the moment that the determination of "public purpose" was issued by the NYSDOT, Amtrak was aware that its property was exposed to the prospect of condemnation in purported violation of the Supremacy Clause, the injury that it now seeks to redress.

Amtrak also contends that no statute of limitations could have been triggered to date because the Commissioner's purported violations constitute a "continuing wrong." "A continuing violation is one in which the plaintiff's interests are repeatedly violated, and, in these circumstances, a new cause of action accrues each time the plaintiff is injured by an act of the defendant." *In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 378 (S.D.N.Y.2002) (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir.1988)). In order to establish a continuing violation, a plaintiff must allege a continuing series of overt acts by the defendant, each of which "must inflict new injury on the plaintiff." *New Phone Co., Inc. v. New York City Dep't of Info. Tech. & Telecommunications*, No. 03 Civ. 3978(JG)(KAM), 2006 WL 6908254, at *16 (E.D.N.Y. Aug. 25, 2006) *subsequently aff'd sub nom. New Phone Co., Inc. v. New York Dep't of Info. Tech. & Telecommunications*, 355 Fed.Appx. 503 (2d Cir. 2009) (citing *Buspirone Patent Litig.*, 185 F.Supp.2d at 378).

There is no "continuing violation" here for the same reason that there is no "ongoing violation of federal law" for the purposes of avoiding the sovereign immunity bar. The wrong that Amtrak asserts stems from the proposed condemnation of Parcel 178 and the Commissioner's condemnation of the remaining six parcels in February 2008—injuries that Amtrak had reason to know of on August 19, 2005. Any "prospect of future additional wrongs" claimed by Amtrak, such as the Commissioner entering or building upon the property, is part of the same alleged wrong—that of the state's taking of the property—and does not "inflict new injury on the plaintiff." *New Phone Co.*, 2006 WL 6908254, at *16.

The fact that the Commissioner has not yet appropriated Parcel 178 is of no moment; as with the condemned parcels, Amtrak had "reason to know" of its injury on the date the Determination and Findings were published. As discussed above, section 401(C) of the EDPL gives the Commissioner ten years from the publication date to commence proceedings pursuant to Article 4 with respect to Parcel 178, because property with respect to the first stage of the project—including the six condemned Amtrak parcels at issue in this case—were commenced within three years of the hearing.

Thus, the NYSDOT has until August 2015 to initiate condemnation proceedings with respect to Parcel 178. Moreover, the State's desire to use that parcel to construct and maintain a bridge over Amtrak's tracks at East 172nd Street was discussed at the public hearing, and the purposes of the project, including the construction of the bridge, were incorporated into the Determination and Findings; as of the publication of those findings, therefore, Amtrak was on notice regarding the potential condemnation of that parcel as part of the project. Amtrak had actual notice of the potential taking of Parcel 178, and it does not claim that the eminent domain process was somehow inadequate as applied to that parcel, or that it had no opportunity in the state proceedings to raise its federal preemption claims for Parcel 178. To now address the proposed taking of Parcel 178 separate and apart from the process afforded under the EDPL for the Bronx River Greenway Project as a whole would, as this Court has noted before, "undermine New York's constitutional unitary scheme for the condemnation of property." *Didden*, 304 F.Supp.2d at 557.

Because I find that Amtrak's claims with respect to the Amtrak Bronx Rail Property are barred by the Eleventh Amendment (as to the six condemned parcels) and the statute of limitations (as to Parcel 178), I do not address the Commissioner's argument that all of those claims are also barred because Amtrak waived its right under the EDPL to appeal the Determination and Findings.

## CONCLUSION

For the foregoing reasons, the NYSDOT Commissioner's motion for summary judgment is granted, and Amtrak's motion is correspondingly denied. The Clerk of the Court is directed to remove the motions at Docket Nos. 22 and 25 from the Court's list of pending motions and to close the file.